UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

No. 15 Civ. 5305 (RJS)

---

OLIVER WYMAN, INC.

Plaintiff,

VERSUS

JOHN EIELSON & ALASTAIR ADAM
Defendants.

---

OPINION AND ORDER
September 22, 2016

---

RICHARD J. SULLIVAN, District Judge:

Plaintiff Oliver Wyman, Inc. brings this suit against Defendants John Eielson and Alastair Adam, its former partners, alleging claims for fraudulent inducement, fraud, breach of contract, violation of Chapter 93A of the Massachusetts General Laws, and several other common law causes of action. (Doc. No. 8 ("FAC" or "First Amended Complaint").) Now before the Court is Defendants' motion to dismiss the First Amended Complaint for failure to state a claim. (Doc. No. 18.) For the reasons set forth, Defendants' motion is granted in part and denied in part.

I. BACKGROUND

A. Facts

In 2002, Defendants co-founded OCC Boston, "a boutique strategy consulting firm" that specialized in "the business media, information services and education sectors." (FAC ¶ 2.)[1] According to Plaintiff, OCC Boston's success depended on Defendants' "personal reputations and relationships with clients." (Id.) In early 2014, Defendants, acting as OCC Boston's co-CEOs, approached Plaintiff, "a leading

---

[1] The following facts are taken from the First Amended Complaint and the parties' Asset Purchase Agreement (Doc. No. 20-4 ("APA")), Non-Solicitation Agreement (Doc. No. 20-4, Ex. L ("NSA")), and Employment Agreement (Doc. No. 20-6 ("EA")). See Halebian v. Berv, 644 F.3d 122, 131 n.7 (2d Cir. 2011) (recognizing that a court may consider documents integral to the complaint on whose "terms and effect" plaintiff relied "in drafting the complaint"). The Court also considers the arguments raised in Defendants' memorandum of law (Doc. No. 19 ("Def. Br.")), Plaintiff's opposition (Doc. No. 23 ("Opp'n")), Defendants' reply (Doc. No. 24 ("Reply")), and the accompanying declarations and exhibits (Doc. Nos. 20, 25).

global management consulting firm" that is headquartered in New York, about the possibility of acquiring OCC Boston. (*Id.* ¶¶ 3, 9.) According to the Amended Complaint, Plaintiff's interest stemmed from OCC Boston's "stable, deep, long-term relationships with clients" in both the "information services and media sectors." (*Id.* ¶ 3.)

In the months that followed, the parties negotiated a possible acquisition of OCC Boston by Plaintiff in face-to-face meetings that took place in New York and Boston and over several telephone calls and emails. (*Id.* ¶ 28.) On March 25, 2014, Defendants sent Plaintiff a "blind profile" of OCC Boston, in which Defendants projected that OCC Boston would continue to grow under Plaintiff's control. (*Id.* ¶¶ 15–16.) According to Plaintiff, the blind profile's growth projections were premised on OCC Boston's strong relationships across the information-services industry and the "cumulative relevant experience" of its partners, including Defendants. (*Id.* ¶ 16.)

After the blind profile "piqued" Plaintiff's interest in purchasing OCC Boston, Plaintiff and OCC Boston executed non-disclosure agreements, pursuant to which OCC Boston's financial advisors sent Plaintiff a confidential memorandum about the company on April 3, 2014. (*Id.* ¶ 19.) The confidential memorandum restated many of the blind profile's claims regarding OCC Boston's growth prospects and future plans, and it similarly underscored OCC Boston's "stable, deep, long-term relationships" and Defendants' combined forty years' experience advising companies. (*Id.* ¶¶ 19–22.) In fact, the confidential memorandum expressly represented that OCC Boston's "[p]artners want to stay on, within the firm and continue to scale it up." (*Id.* ¶ 24.) During the parties' negotiations, Defendants also discussed with Plaintiff's senior executives their client relationships and their expectations for revenue growth. (*Id.* ¶¶ 29–32.) At one point, Adam told Plaintiff's chief strategy officer that he was "excited about the opportunity to work and build together" at Oliver Wyman. (*Id.* ¶ 33.)

According to Plaintiff, the revenue growth for OCC Boston projected by Defendants would not have been possible without Defendants' continued engagement as its partners. (*Id.* ¶¶ 23, 58.) Plaintiff avers that the "primary selling points" for Plaintiff were Defendants' representations that they intended to stay with the business after the sale and revenue projections predicated on their continued presence. (*Id.* ¶ 27.) Plaintiff avers that it was particularly attracted to Defendants' "strong presence and enduring relationships" within the information services industry, in which Plaintiff wished to expand its practice and acquire relationships. (*Id.* ¶ 30.)

On October 29, 2014, the parties entered into an Asset Purchase Agreement, whereby Plaintiff agreed to purchase OCC Boston on December 1, 2014, for up to $16,500,000. (APA ¶¶ 3.1(a), 3.2(a).) Plaintiff also agreed to employ OCC Boston's former partners, including Defendants, pursuant to a series of contracts, including the Employment Agreements and Non-Solicitation Agreement. (FAC ¶¶ 4, 41; APA ¶ 10.6(a).) In the Employment Agreement, Defendants agreed to "devote substantially all of" their "professional time, attention and energies to" Plaintiff's business. (EA ¶ 7(a)). Both the Asset Purchase Agreement and Non-Solicitation Agreement included non-compete and non-solicitation covenants. (APA ¶¶ 6.5; NSA ¶ 2.)

Although the Employment Agreement covered a four-year term, the parties' agreements also included several provisions

that addressed the possibility that Defendants would leave Oliver Wyman's employment prior to the end of their term. The Employment Agreement included remedies in the event of Plaintiffs' resignation without "Good Reason." (EA ¶¶ 5(d) 6, 6(a).) Relatedly, the Asset Purchase Agreement stipulated that former OCC Partners, including Defendants, would each be awarded up to $500,000 in retention bonuses at the start of their third and fourth years *if* they remained employed by Plaintiff. (APA ¶ 10.10.) On the other hand, the Asset Purchase Agreement also provided that if any former OCC Boston Partner left Oliver Wyman before the end of the four-year term, Plaintiff's obligation to pay the remainder of that partner's share of the purchase price would be deferred until December 2024, with interest accruing at a rate of 0.5% per annum. (APA, Ex. E § 1(a).)

Plaintiff alleges that both before and after joining Oliver Wyman's employment, Defendants searched for opportunities to exit the consulting industry, cash out from the sale of their business, and become active investors. (FAC ¶¶ 44–45.) Plaintiff points to a January 25, 2015 email exchange between Defendants in which they contemplated leaving Plaintiff only weeks after having consummated the sale of OCC Boston. (*Id.* ¶ 47.) Plaintiff further alleges that Defendants, having "every intention to exit the consulting industry," "did not work diligently" at Oliver Wyman and "did not exercise their best efforts" to grow Oliver Wyman's business. (*Id.* ¶ 49.) Specifically, Plaintiff asserts that Defendants' productivity from January through April 2015 was "dramatically lower" than that of other former OCC Boston partners who joined Oliver Wyman. (*Id.*) In an email to a third party in February 2015, Defendant John Eielson in fact admitted, "I don't really work anymore." (*Id.*)

On April 21, 2015, Defendants notified Plaintiff that they were resigning, and on May 8, 2015 Defendants left Oliver Wyman's employment. (*Id.* ¶ 5.) Plaintiff alleges that, in an effort to conceal their scheme, Defendants falsely claimed in their exit interviews that they had decided to leave between April 18 through April 20, 2015. (*Id.* ¶ 50.) According to Plaintiff, Defendants' departure significantly lowered the value of the OCC Boston business that it purchased. (*Id.* ¶ 62.)

B. Procedural History

On June 16, 2015, Plaintiff, a Delaware corporation whose principal place of business is New York, filed suit against Defendants, who are Massachusetts citizens, in the Supreme Court of the State of New York, New York County. (FAC ¶¶ 9–11; Doc. No. 1-1.) On July 9, 2015, Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441, 1446. (Doc. No. 1.) On July 14, 2015, Plaintiff filed the First Amended Complaint, which Defendants moved to dismiss on September 11, 2015. (Doc. No. 18.) The motion was fully briefed on October 27, 2015. (Doc. No. 24.)

II. CHOICE OF LAW

Before addressing the substance of Plaintiff's claims, the Court must determine whether New York or Massachusetts law applies. Because the Court's jurisdiction is premised on the parties' diversity, the Court "must look to the choice of law rules of the forum state," which is New York. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

With respect to Plaintiff's third, fourth, and fifth claims for breach of contract, all relevant agreements – the Asset Purchase Agreement, the Employment Agreement, and the Non-Solicitation Agreement – contain identical New York choice-of-law clauses. *See* APA ¶ 13.10; EA ¶ 12; NSA ¶

3

9. "New York courts will generally 'enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction.'" *Ergowerx Int'l, LLC v. Maxell Corp. of Am.*, 18 F. Supp. 3d 430, 439 n.5 (S.D.N.Y. 2014) (quoting *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006)). Since Plaintiff's principal place of business is New York, the parties allegedly held several face-to-face meetings in New York to negotiate their agreements (FAC ¶¶ 7, 28), and neither party disputes application of New York law with respect to the third, fourth, and fifth causes of action, the Court concludes that New York law governs the parties' contract claims.

Furthermore, the parties have relied exclusively on New York law in their briefs addressing the sufficiency of Plaintiff's sixth, seventh, eighth, ninth, and eleventh claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, tortious interference with existing and prospective contractual and business relationships, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Accordingly, the parties have "impliedly manifested their acquiescence to New York law controlling" those disputes. *DER Travel Servs., Inc. v. Dream Tours & Adventures, Inc.*, No. 99-cv-2231 (HBP), 2005 WL 2848939, at *6 (S.D.N.Y. Oct. 28, 2005) (collecting authorities). And since Plaintiff's tenth cause of action relates to a specific provision of the Massachusetts General Laws, there is no dispute that this claim, if it is to proceed at all, would be governed by Massachusetts law.

What the parties *do* dispute, however, is whether New York or Massachusetts law should govern Plaintiff's first and second causes of action for fraud and fraudulent inducement. (*Compare* Def. Br. 8–9, *with* Opp'n 16–17.) Because the choice-of-law provisions contained in the parties' agreements do not purport to govern tort claims (*see* APA ¶ 13.10; EA ¶ 12; NSA ¶ 9), the Court must engage in a separate choice-of-law analysis for Plaintiff's fraud claims. *See Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 611 (2d Cir. 1996). Under New York law, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley*, 153 F.3d at 12. A conflict exists "[w]here the applicable law from each jurisdiction provides different substantive rules." *Id.* Although the elements of fraud are similar under both New York and Massachusetts law, "under New York law the allegations must be proven by clear and convincing evidence, not merely by a preponderance as under Massachusetts law," a difference that is "enough to establish that a conflict exists," even on a Rule 12(b)(6) motion. *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 283 (S.D.N.Y. 2009) (internal quotation marks omitted). Given this conflict, the Court must proceed to the second step in New York's choice of law analysis for tort cases and apply the law of the jurisdiction that has the greatest interest in the litigation. *Curley*, 153 F.3d at 12.

"Under the interest analysis test, torts are divided into two types, those involving the appropriate standards of conduct . . . and those that relate to allocating losses that result from admittedly tortious conduct." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006) (internal quotation marks omitted). For conduct-regulating rules, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id.* In a fraud claim, "the locus of the tort is generally deemed to be the place where the injury was inflicted, rather than where the fraudulent act

4

originated." *In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir. 2013); *accord Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 1973) ("[A] cause of action for fraud arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence.") (Friendly, J.). Accordingly, "[u]nder New York conflict of law principles, fraud claims are governed by the state in which the injury is deemed to have occurred, which is usually where the plaintiff is located." *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 89 F. App'x 287, 288 (2d Cir. 2004); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 292 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001).

Here, Plaintiff's principal place of business is New York, and the complaint alleges that Plaintiff's injuries occurred in New York. (FAC ¶¶ 7, 13; *see also* NSA ¶ 9 (acknowledging that Plaintiff's leadership team is located in New York).) While Plaintiff argues in its opposition brief that it suffered injury in Massachusetts because OCC Boston's assets, which Plaintiff now owns, are located there (Opp'n 17), the Court finds Plaintiff's argument to be unpersuasive, since the relevant inquiry is where Plaintiff suffered the "most severe business injury," which was in its principal place of business, New York. *See Deere & Co. v. MTD Prod., Inc.*, No. 00-cv-5936 (LMM), 2002 WL 1837402, at *4 (S.D.N.Y. Aug. 12, 2002) ("Plaintiff's injury occurs where its principal place of business is located because a plaintiff suffers the most severe business injury in that state.").

Notwithstanding this clear authority, Plaintiff points to the Second Circuit's decisions in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012) ("*Licci I*") and *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 49 (2d Cir. 2013) ("*Licci II*") for the proposition that the Court should apply the law of Massachusetts, since several of the alleged misrepresentations and omissions originated in that state. (Opp'n 16–17.) But Plaintiff's reliance on the *Licci* decisions is misplaced. In *Licci*, the Second Circuit applied New York law to a negligence suit brought against a New York-based bank for providing wire transfer services to terrorist organizations that caused plaintiffs' injuries in Israel, largely because New York was the site of the banks' allegedly wrongful conduct. *See Licci II*, 739 F.3d at 50–51. Nevertheless, the Second Circuit instructed courts to take a "'flexible approach' that aims to give effect to the law of the jurisdiction with 'the greatest concern with the specific issue raised in the litigation.'" *Benefield v. Pfizer Inc.*, 103 F. Supp. 3d 449, 459 (S.D.N.Y. 2015) (quoting *Licci I*, 672 F.3d at 158).

Here, Plaintiff itself acknowledges that several of the alleged misrepresentations and omissions occurred during face-to-face meetings that took place in New York. (FAC ¶¶ 13, 28.) Moreover, application of New York law "accords with the reasonable expectation of both parties." *Benefield*, 103 F. Supp. 3d at 459. Whereas *Licci* involved intervening criminal acts by third parties, who used defendant's banking services to fund illegal terrorist activities in a foreign country, Defendants in this suit allegedly intended their actions to cause injury to Plaintiff in New York. (*See* FAC ¶ 13.) Thus, unlike in *Licci*, "the location of the alleged injury here was not a mere fortuity, but the result of Defendants' deliberate efforts . . . ." *Benefield*, 103 F. Supp. 3d at 459. Accordingly, the Court applies the law of New York, the state of Plaintiff's residence, to Plaintiff's fraud-based claims, a conclusion that is consistent with the approach taken by a majority of district courts to have considered this issue after

5

*Licci*. *See In re: Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 196–97 (S.D.N.Y. 2016) (fact that plaintiff suffered loss from defendants' alleged torts in state of plaintiff's residence "weighs heavily in favor of applying" that state's law); *Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13-cv-1654 (RA), 2014 WL 2610608, at *41 (S.D.N.Y. June 10, 2014) (same); *Manney v. Reichert*, No. 13-cv-4413 (SJF) (GRB), 2014 WL 1315382, at *8–9 (E.D.N.Y. Mar. 28, 2014) (same), *adhered to on reconsideration*, No. 13-cv-4413 (SJF) (GRB), 2014 WL 4805046 (E.D.N.Y. Sept. 26, 2014); *but see Lyman Commerce Sols., Inc. v. Lung*, No. 12-cv-4398, 2014 WL 476307 (TPG), at *3 (S.D.N.Y. Feb. 6, 2014).

III. SUFFICIENCY OF THE PLEADINGS

Having resolved the necessary choice of law issues, the Court now addresses the sufficiency of Plaintiff's pleadings. To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id*. at 570.

The Court will address each of Plaintiff's claims in turn.

A. Fraud and Fraudulent Inducement

To state a claim for fraud under New York Law, a plaintiff must sufficiently plead the following elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). Fraudulent inducement is a "type of fraud," which "'arises from a promisor's successful attempts to induce a promisee to enter into a contractual relationship despite the fact that the promisor harbored an undisclosed intention not to perform under the contract.'" *Barrie House Coffee Co. v. Teampac, LLC*, No. 13-cv-8230 (VB), 2016 WL 3645199, at *7 (S.D.N.Y. June 30, 2016) (quoting *Neckles Builders, Inc. v. Turner*, 117 A.D.3d 923, 925, (2d Dep't 2014)). A cause of action for fraudulent inducement must therefore "satisfy the same elements" as a claim for fraud. *Comolli v. Huntington Learning Ctrs., Inc.*, 117 F. Supp. 3d 343, 349 (S.D.N.Y. 2015). Claims for fraud and fraudulent inducement are subject to the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure, which requires "a party [to] state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ.

6

P. 9(b); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) ("[T]he complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.").

Here, Plaintiff alleges that Defendants induced Plaintiff to purchase OCC Boston by misrepresenting their intention to work for Plaintiff for at least four years throughout the negotiation process. (FAC ¶¶ 16–18, 20–26, 29–33, 64–65, 70.) Among other things, Plaintiff points to Defendants' written statements in the blind profile, dated March 25, 2014, and confidential memorandum, dated April 3, 2014, which provided growth projections premised on Defendants' remaining with the company. (*Id.* ¶¶ 15–17, 19, 22–23.) Plaintiff also alleges that Adam emailed a senior Oliver Wyman executive on August 1, 2014 to indicate that he was "excited about the opportunity to work and build together" at Oliver Wyman. (*Id.* ¶ 33.)

However, it is well-settled law that allegations "amount[ing] to little more than intentionally-false statements" indicating intent to perform under a contract do not state a claim for fraud. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996). Although "not every fraud claim is foreclosed in an action also involving a contract," *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006), a fraud claim must still adequately allege one of the following conditions to withstand dismissal: "[1] a legal duty separate from the duty to perform under the contract," "[2] a fraudulent misrepresentation collateral or extraneous to the contract," or "[3] special damages that are caused by the misrepresentation and unrecoverable as contract damages," *Bridgestone/Firestone*, 98 F.3d at 20 (internal citations omitted).

While Plaintiff alleges that Defendants acted as their fiduciaries after starting employment (FAC ¶¶ 92–94), Plaintiff has not plausibly alleged that any separate legal duty existed at the time the parties were negotiating the purchase of OCC Boston. Furthermore, although Plaintiff requests punitive damages in its Prayer for Relief, "[a] general request for punitive damages is not enough to differentiate the damages recoverable for fraud from those sought for breach of contract." *Sekisui Am. Corp. v. Hart*, No. 12-cv-3479 (SAS), 2012 WL 5039682, at *3 (S.D.N.Y. Oct. 17, 2012). Accordingly, neither the first nor the third conditions of the *Bridgestone/Firestone* test are met.

Nevertheless, Plaintiff maintains that Defendants' alleged promises to remain at the firm for at least four years were collateral and extraneous to the parties' contracts, which did not *guarantee* that Defendants would remain at the firm and in fact permitted Defendants to leave at any time. (Opp'n 8–10; *see also* EA ¶ 6.) Thus, Plaintiff argues that Defendants' misrepresentations regarding their intent to stay at the firm "had nothing to do with their intent to comply with their contractual obligations because they never had any such contractual obligations." (Opp'n 10 (internal quotation marks omitted).)

But this argument, while accurate in its characterization of the contracts, does not support the viability of Plaintiff's fraud claims. To the contrary, as several judges in this district have recognized, "[w]here courts have found viable fraud claims based on fraudulent misrepresentation, the statements concerned matters separate and distinct from *the subject matter of the contract*." *E. Cont'l Min. & Dev. Ltd. v. Signet Grp. LLC*,

7

No. 13-cv-1930 (KBF), 2013 WL 6503526, at *6 (S.D.N.Y. Dec. 9, 2013) (emphasis added) (quoting *MCI Worldcom Commc'ns, Inc. v. N. Am. Commc'ns Control, Inc.*, No. 98-cv-6818 (LTS), 2003 WL 21279446, at *9 (S.D.N.Y. June 4, 2003)). Here, the allegedly false statements made by Defendants involved the duration and terms of Defendants' continued employment at Oliver Wyman, subjects that were expressly covered by the Asset Purchase, Non-Solicitation, and Employment Agreements. As noted above, these documents expressly defined the scope of the parties' rights and obligations in the sale of OCC Boston and set forth the conditions of Defendants' employment by Plaintiff. Significantly, the agreements did not guarantee or require that Defendants would remain employees of Plaintiff for their entire four-year term. In fact, these agreements contemplated the very possibility that Defendants would leave Oliver Wyman's employment before the end of their terms. Under Section 6 of the Employment Agreement, Defendants could resign, with or without "Good Reason," and Sections 6(a) and 6(b) outlined the various rights and obligations each Defendant would have in the event of his resignation from Plaintiff. (EA ¶¶ 6, 6(a), 6(b).) Furthermore, the Asset Purchase Agreement included retention bonuses that each Defendant would earn on his third and fourth anniversaries of employment in the event that he stayed at the company (APA ¶ 10.10), but also provided for deferral of payment of each Defendant's share of the purchase price in the event that he left prior to the end of the four-year term (APA, Ex. E § 1(a).) Because the parties' agreements specifically addressed the duration and terms of Defendants' employment, Defendants' alleged misrepresentations regarding their intent to remain at Oliver Wyman were not "collateral to the subject matter of the contract." *See Clifton v. Vista Computer Servs., LLC*, No. 01-cv-10206 (JSM), 2002 WL 1585550, at *3–4 (S.D.N.Y. July 16, 2002) (because contract at issue "expressly acknowledge[d] the possibility of acquiring the funding" but also "specifically deal[t] with the possibility that there will not be financing," defendant's alleged extraneous promise to obtain a $3,000,000 financing commitment was not "'extraneous' to the contract"). Therefore, Plaintiff's fraud and fraudulent inducement claims, which are premised on Defendants' implicit and explicit promises to remain at Plaintiff for four years, fail as a matter of law.

For similar reasons, Plaintiff also fails to sufficiently allege justifiable reliance on Defendants' alleged misstatements and omissions. In assessing allegations of justifiable reliance, "New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004). Because justifiable reliance is "a fact-specific inquiry," it is "generally considered inappropriate for determination on a motion to dismiss." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007) (quoting *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03-cv-3748 (DAB), 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006)). Even so, "whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss" under certain circumstances. *See, e.g.*, *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999). Specifically, where sophisticated parties rely on "representations contrary to the plain language of the agreements" they enter, courts have found such reliance to be "patently unreasonable." *Republic Nat. Bank v. Hales*, 75 F. Supp. 2d 300, 315 (S.D.N.Y. 1999), *aff'd sub nom.*,

*HSBC Bank USA v. Hales*, 4 F. App'x 15 (2d Cir. 2001); *see also Lam v. Am. Exp. Co.*, 265 F. Supp. 2d 225, 230–31, 239 (S.D.N.Y. 2003) (finding that plaintiff's reliance on employer's promise that he would receive incentives was unreasonable as a matter of law, since defendant could terminate plaintiff at any time before the incentive plan vested); *Clifton*, 2002 WL 1585550, at *4 ("When a promise is not extraneous to the terms of the contract, a plaintiff with this level of business sophistication cannot make out a claim that he reasonably relied on those promises.").

As already discussed, the plain language of the agreements made clear that Defendants did not guarantee that they would remain in Oliver Wyman's employment for four years. To the contrary, the contracts contemplated the possibility that Defendants would leave early. It follows, *a fortiori*, that any reliance by Plaintiff, a highly sophisticated multinational consulting firm, on Defendants' extra-contractual promises to stay for at least four years was patently unreasonable. Thus, Plaintiff's claims for fraudulent inducement and fraud fail for this independent reason.

### B  Breach of the Non-Solicitation Provision of the Asset Purchase Agreement

Next, the Court considers Count Three, Plaintiff's claim for breach of the non-solicitation covenant under the Asset Purchase Agreement. Specifically, Plaintiff alleges that Defendants violated this provision by "endeavoring to cause each other to separate from their employment" with Plaintiff. (FAC ¶ 80.) Significantly, Plaintiff makes no allegation that either Defendant employed the other to work in competition with Plaintiff.

Under the Asset Purchase Agreement, Defendants each covenanted that, in the event of a separation from Plaintiff, he would not "solicit or hire, or assist in the solicitation or hiring of, or otherwise engage or assist in engaging any employee of Oliver Wyman or its Affiliates who performs consulting services." (APA ¶ 6.5(a)(vi).) The critical question on this motion is the meaning of the term "solicit." The Court begins this inquiry by considering the plain meaning of that term. *See Bank of N.Y. Trust Co. v. Franklin Advs., Inc.*, 726 F.3d 269, 280 (2d Cir. 2013) ("We are bound, first and foremost, by the terms' plain meaning."). The ordinary meaning of the verb "solicit" is "to ask or seek earnestly or pleadingly." *United States v. Friedenthal*, No. 97-CrMisc.-1 (THK), 1997 WL 786371, at *3 (S.D.N.Y. Dec. 19, 1997). The meaning of the word "solicit" is further illuminated by its context. *See 242-44 E. 77th St., LLC v. Greater N.Y. Mut. Ins. Co.*, 31 A.D.3d 100, 103–04 (1st Dep't 2006) (noting that "the meaning of a word in a series of words is determined by the company it keeps" (internal quotation marks omitted)). The Asset Purchase Agreement prohibits "solicit[ing]," "hir[ing]," or "*otherwise engag[ing]*" another employee "who performs consulting services" (emphasis added). Here, the term "solicitation" must relate to the term "engagement," *i.e.*, the act of employing a person. *See Trachtenberg v. Rosenblum*, 24 A.D.2d 1062, 1063 (3d Dep't 1965) ("'Employ' and 'hire' are often synonymous, as 'to employ' is, by dictionary definition, to 'engage the services of' or 'to provide with a job that pays wages'; and 'to hire' is to 'employ for wages.'" (citation omitted)). In light of this context, the Court concludes that the provision prohibits solicitation of Plaintiff's other consultants for the purpose of employing them outside of the firm.

Here, Plaintiff alleges that Defendants violated this provision by "endeavoring to

9

cause each other to separate from their employment with [Plaintiff], and coordinating their resignations to take place on the same date." (FAC ¶ 80.) Plaintiff does not, however, allege that either Defendant employed or attempted to employ the other to perform consulting services elsewhere. Because Plaintiff's allegations, which focus exclusively on Defendants' separation from Oliver Wyman without reference to *other* employment, fall outside the ambit of the Asset Purchase Agreement's non-solicitation provision, the Court grants Defendants' motion to dismiss Count Three of the Complaint. *See Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 349 (S.D.N.Y. 2013) ("Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss.").

### C. Breach of the Non-Solicitation Agreement

Plaintiff's fifth cause of action raises identical allegations under the Non-Solicitation Agreement. (*See* FAC ¶ 90 (alleging that Defendants violated the Non-Solicitation Agreement "by soliciting each other and otherwise endeavoring to cause each other to separate from employment from [Plaintiff], and coordinating their resignations to take place on the same date").) Nonetheless, the Court reaches a different conclusion because of that provision's distinct wording.

In the Non-Solicitation Agreement, each Defendant agreed that during his employment at Plaintiff, and during the year following, he:

> shall not, either on [his] own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of the Company with whom Employee, during the last two (2) years of Employee's employment with the Company, came into contact for the purpose of selling or providing Consulting Services or soliciting Clients and Prospects for the purpose of selling or providing Consulting Services or about whom Employee obtained Confidential Information, to separate from employment by the Company.

The Court again starts its analysis with the premise that the Non-Solicitation Agreement, "like any contract, must be construed to effectuate the intent of the parties as derived from the plain meaning" of its terms. *Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999). The Non-Solicitation Agreement, by its plain language, prohibits *any effort* to "endeavor to cause" any Oliver Wyman employee with whom Defendant "came into contact for the purpose of . . . providing Consulting Services" to leave the company. Thus, it is at least plausible that this includes efforts to encourage a consultant to leave Plaintiff, which is precisely what Plaintiff alleges here.

Defendants argue that "the most reasonable interpretation of this provision" is that, like the Asset Purchase Agreement's non-solicitation provision, it "prevents poaching of employees" to join a competing business. (Def. Br. 20.) Defendants underscore the fact that the provision implicates only employees with whom Defendants came into contact for the purpose of providing "Consulting Services" or about whom the employee obtained confidential information, and that this limitation "would not make sense if the purpose of the provision was merely to promote general retention of employees," since it permits solicitation of other employees whom Defendants only knew socially. (*Id.*)

10

The Court finds Defendants' argument unpersuasive. In their attempt to conflate the two agreements' respective non-solicitation provisions, Defendants elide the linguistic differences between them. *See Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008) ("The rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract."). As already stated, the Non-Solicitation Agreement provision applies more broadly, to any "endeavor to cause" certain employees to depart Plaintiff. And while it is true, as Defendants note, that restrictive covenants "are not favored and will only be enforced to the extent reasonable and necessary to protect valid business interests" (Reply 8 (quoting *Morris v. Schroder Capital Mgmt. Int'l*, 7 N.Y.3d 616, 620 (2006)), "[t]he question the Court must resolve with regard to [Defendants'] motion is not whether [the] restrictive covenant is reasonable, but rather whether [Plaintiff] has stated a plausible breach of contract claim." *Bernato v. Arthur J. Gallagher & Co.*, No. 15-cv-1544 (KBF), 2015 WL 4643165, at *6 (S.D.N.Y. Aug. 5, 2015).

Here, Plaintiff alleges that Defendants encouraged each other to leave the firm and hatched a "joint plan to exit the consulting industry." (FAC ¶¶ 47, 80.) Plaintiff points to several contemporaneous emails in which Defendants discuss their contemplated resignations from Plaintiff. For example, Plaintiff points to a January 25, 2015 email in which Eielson indicated to Adam that he was "not sure [that he was] going to make it to June," which prompted a response from Adam that he "[did not] think about much else these days." (*Id.* ¶ 47.) Defendants' alleged lack of productivity, and their departure on the same day, certainly support the inference that Defendants coordinated and encouraged each other to leave Plaintiff. *See Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 443 (S.D.N.Y. 2011) (suspicious timing of defendants' resignations "support[s] a plausible claim that [defendants] violated the terms of their employment contracts" by soliciting employees with whom they worked to leave). And it is clearly plausible that Defendants, both high-level consultants who were employed to further develop their former OCC Boston business within Oliver Wyman, "came into contact for the purpose of . . . providing Consulting Services," and therefore, were both within the class of employees who could not be encouraged to leave. (NSA ¶ 2.) Consequently, the Court finds that Plaintiff states a plausible claim for breach of the Non-Solicitation Agreement, and declines Defendants' invitation to dismiss this claim at this early stage of the proceedings.

D.  Breach of Employment Agreement

The Court next turns to Plaintiff's cause of action for breach of the Employment Agreement, in which Defendants agreed to "devote substantially all of" their "professional time, attention and energies to" Oliver Wyman. (EA ¶ 7(a); *see also* FAC ¶¶ 84-85.) Plaintiff alleges that Defendants "did not work diligently" during their short time at the firm, and "did not exercise their best efforts to sell and deliver client projects, [and] to grow [Plaintiff's] business." (FAC ¶ 49.) In fact, Plaintiff alleges that Defendants' productivity during the period between January and April 2015 "lagged significantly behind every other OCC Boston partner who came to [Plaintiff] as of December 1, 2014," and that the revenues generated by Defendants during that time period were "dramatically lower" than the revenue estimates per partner that Defendants themselves projected in the lead-up to the transaction. (*Id.*) Plaintiff also points to an email from Defendant John Eielson, composed in February 2015, in

11

which he admitted, "I don't really work anymore." (*Id.*) The Court concludes that these allegations state a viable claim for breach of the Employment Agreement.

Defendants argue that dismissal is nonetheless appropriate because Plaintiff did not comply with the Employment Agreement's notice-and-cure provision, which required Plaintiff to "provide prompt written notice" to an employee breaching the agreement, "specifying in reasonable detail the conduct or act constituting such violation and the method(s), if any, by which Employee may cure such violation." (EA ¶ 7(b); *see also* Def. Br. 22; Reply 9.) As Defendants underscore, the Amended Complaint does not allege that Plaintiff provided Defendants with any notice of their breach. (Def. Br. 23.)

Nevertheless, while it is true that a party generally may not recover under a contract if it has failed to fulfill a condition precedent, such as a notice-and-cure provision, *see Unloading Corp. v. State of N.Y.*, 132 A.D.2d 543, 543 (2d Dep't 1987), "New York common law will not require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless," *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209 (2d Cir. 2014); *see also Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 552 n.6 (S.D.N.Y. 2014) (noting that under New York law, "a party need not provide notice of and an opportunity to cure a breach when doing so would be futile"). Here, in light of the fact that Defendants resigned within a few months of joining Plaintiff, it is plausible that Plaintiff was not fully aware of Defendants' breach at the time of their departure or that Defendants left before they could have cured their breach, and, therefore, Plaintiff's compliance with the condition precedent would have been futile. In their reply, Defendants surmise that Plaintiff must have been aware of Defendants' lack of productivity during their time at the firm, and therefore had "ample opportunity to provide Defendants notice of its dissatisfaction prior to Defendants' departure." (Reply 9.) But Defendants' arguments regarding when Plaintiff might have "reasonably believed" that Defendants were in breach and the promptness of Plaintiff's response are better addressed by the trier of fact, not by the Court on a motion to dismiss. *See Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 310 (2d Cir. 2016) ("Where the promptness of breach discovery is questioned, resolution depends on an assessment of the totality of circumstances," which are "generally determined by the trier of fact rather than the court, particularly when the ultimate question is reasonableness."). For these reasons, the Court denies Defendants' motion to dismiss Count Four.

E. Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty

The Court next turns to Plaintiff's sixth claim alleging breach of fiduciary duty and seventh claim for aiding and abetting a breach of fiduciary duty. Defendant urges the Court to dismiss these claims because they impermissibly duplicate Plaintiff's claims for breach of contract. The Court agrees.

A claim for breach of fiduciary duty under New York law requires: "[1] the existence of a fiduciary duty; [2] a knowing breach of that duty; and [3] damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). However, "a cause of action for breach of fiduciary duty [that] is merely duplicative of a breach of contract claim cannot stand." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011). Here,

Plaintiff alleges that Defendants, by virtue of their employment, owed fiduciary duties to Plaintiff, which they breached by: (1) misrepresenting their reasons for resigning, (2) "encouraging each other to resign," and (3) "devoting their time during their employment to planning their departure." (FAC ¶ 93–94.) However, these allegations are wholly duplicative of Plaintiff's allegations for breach of contract. (*See id.* ¶¶ 80 (alleging that Defendants breached their non-solicitation covenants "by endeavoring to cause each other to separate from" Plaintiff), 85 (alleging that Defendants breached the Employment Agreement "by using company resources and devoting their time during their employment to planning their departure from [Plaintiff]"), 90 (alleging that Defendants violated the Non-Solicitation Agreement by "endeavoring to cause each other" to leave Plaintiff).) Plaintiff's claim for breach of fiduciary duty thus duplicates its claims for breach of contract and must be dismissed.

It inexorably follows that where a "breach of fiduciary duty claim fails" because it is duplicative of a breach of contract claim, "there can be no cause of action for aiding and abetting breach of that fiduciary duty." *Kassover v. Prism Venture Partners, LLC*, 53 A.D.3d 444, 449 (1st Dep't 2008); *accord Fesseha v. TD Waterhouse Inv'r Servs., Inc.*, 305 A.D.2d 268, 269 (1st Dep't 2003). Here, Plaintiff alleges that each Defendant aided and abetted the other's breach of fiduciary duty. (FAC ¶¶ 97–98.) However, since Plaintiff fails to sufficiently allege a breach of fiduciary duty by either principal, Plaintiff's aiding and abetting fiduciary duty cause of action also fails and, therefore, must be dismissed.

F. Tortious Interference

The Court next considers Plaintiff's eighth cause of action, which alleges "tortious interference with existing and prospective contractual and business relationships." (FAC at 29.) Plaintiff avers that Defendants "engaged in enticement, solicitation and inducement of each other to cease performing services for [Plaintiff], and to cease delivering their best efforts to grow the business of [Plaintiff]." (*Id.* ¶ 102.) Though its pleading is imprecise, Plaintiff appears to bring claims for both tortious interference with contract and, in the alternative, tortious interference with prospective business advantage. (*See* Opp'n 24 (citing *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521 (S.D.N.Y. 2002)).) Once again, the Court concludes that both claims fail as a matter of law.

In order to prevail on a claim for tortious interference with contract under New York law, a plaintiff must plausibly allege: "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996). Significantly, a claim for tortious interference with contract that "does no more than restate" a plaintiff's breach of contract claim will not suffice. *Allerand LLC v. 233 E. 18th St. Co.*, 19 A.D.3d 275, 278 (1st Dep't 2005); *accord In re Musicland Holding Corp.*, 386 B.R. 428, 441 (S.D.N.Y. 2008), *aff'd*, 318 F. App'x 36 (2d Cir. 2009). Here, the same acts that Plaintiff claims violated the Asset Purchase Agreement and Non-Solicitation Agreement – namely, each Defendant's "enticement, solicitation and inducement of each other" to leave Plaintiff and "cease delivering their best efforts to grow" the company – form

13

the basis for Plaintiff's tortious interference with contract claim. (FAC ¶ 102.) Because these allegations merely restate Plaintiff's breach of contract claim, the tortious interference with contract claim cannot stand.

Nor does Plaintiff fare any better with its claim for tortious interference with prospective business advantage. In order to plead such a claim under New York law, a plaintiff must allege that: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). However, because Plaintiff's cause of action for tortious interference with prospective business advantage, like Plaintiff's claim for tortious interference with contract, is premised on the very same allegations that form the breach of contract claims (*see* FAC ¶ 102), it also must fail, *see Susman v. Commerzbank Capital Mkts. Corp.*, 95 A.D.3d 589, 590 (1st Dep't. 2012) (claim for tortious interference with prospective business advantage that simply duplicated breach of contract claim "properly dismissed"); *Boscorale Operating, LLC. v. Nautica Apparel, Inc.*, 298 A.D.2d 330, 332 (1st Dep't 2002) (same).

The claim also fails because of Plaintiff's failure to adequately allege the third element – that "defendants acted for a wrongful purpose or used dishonest, unfair, or improper means." *Scutti Enterprises, LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003). Under New York law, "wrongful purpose" and "dishonest, unfair, or improper means" have been narrowly construed to include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure," but not "persuasion" designed to interfere with a prospective contract. *Id.* at 216; *see also Enzo Biochem, Inc. v. Molecular Probes, Inc.*, No. 03-cv-3816 (RJS), 2013 WL 6987615, at *3 (S.D.N.Y. Dec. 6, 2013) (underscoring that this element "represents a particularly high hurdle, for it requires a plaintiff to show that the defendant committed a crime or an independent tort [such as fraud], or [acted] for the sole purpose of inflicting intentional harm on the plaintiff" (internal quotation marks omitted)). Here, Plaintiff tepidly asserts that Defendants encouraged each other to abandon their consulting practice at Oliver Wyman and to leave the firm. (FAC ¶ 102.) These bland attempts at persuasion do not come close to satisfying the conduct actionable under a tortious interference with prospective business advantage claim.

Accordingly, Plaintiff's claims for tortious interference with contract and tortious interference with prospective business advantage are dismissed.

### G. Implied Covenant of Good Faith and Fair Dealing

Plaintiff's ninth cause of action alleges that Defendants breached the implied covenant of good faith and fair dealing by resigning, and thus depriving Plaintiff of "the benefits of the [Asset Purchase Agreement], namely the client relationships, goodwill and increased business" that hinged on Defendants' continued presence at the company. (FAC ¶ 107.) Plaintiff also alleges that Defendants breached the implied covenant by "intentionally and deliberately conceal[ing]" their plan to resign. (*Id.* ¶ 108.)

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."

14

*Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002). It follows, therefore, that "[n]o implied covenant may conflict with the express terms of a contract." *Red Rock Commodities, Ltd. v. ABN-AMRO Bank, N.A.*, No. 94-cv-8390 (SAS), 1995 WL 714349, at *3 (S.D.N.Y. Dec. 5, 1995), *aff'd*, 101 F.3d 1394 (2d Cir. 1996). The agreements here expressly provided for the conditions and terms of Defendants' employment, and as noted above, nowhere did they require Defendants to stay for four years or prohibit Defendants from resigning prior to the completion of a four-year term. Plaintiff could have insisted on Defendants remaining with the company as a condition of the agreement; it could also have structured more draconian clawback provisions or deferred compensation consequences in the event of an early departure. For whatever reasons, it did not do so, and instead entered into employment agreements that expressly allowed Defendants to leave at any time – albeit with significant consequences in the event of an early departure. In light of these explicit terms of the contract, Defendants cannot possibly have been bound by a separate implied covenant that obligated them to a conflicting duty to remain with Plaintiff for at least four years. For these reasons, Plaintiff's claim for breach of the implied covenant likewise fails to state a claim.

### H. Unjust Enrichment

The Court next turns to Plaintiff's eleventh cause of action for unjust enrichment. A plaintiff alleging unjust enrichment under New York law must adequately plead that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). It is "impermissible" for a party to bring an unjust enrichment claim when that party "has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Ellington Credit Fund, Ltd.*, 837 F. Supp. 2d at 202 (quoting *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987)). While Defendants dispute the enforceability of certain non-solicitation covenants, the parties otherwise do not contest that the Asset Purchase Agreement, the Non-Solicitation Agreement, and the Employment Agreement are enforceable contracts that govern the subject matter of this dispute – namely, the rights and obligations of the parties in connection with the sale of OCC Boston. Furthermore, while Plaintiff is correct that an unjust enrichment claim "is not duplicative of a breach of contract claim where the plaintiff alleges that the contracts were induced by fraud" (Opp'n 24 (quoting *Tropical Sails Corp. v. Yext, Inc.*, No. 14-cv-7582 (JFK), 2015 WL 2359098, at *7 (S.D.N.Y. May 18, 2015)), the Court has already concluded that Plaintiff's fraud and fraudulent inducement claims fail as a matter of law. Therefore, the Court dismisses Plaintiff's claim for unjust enrichment, which is duplicative of, and wholly subsumed by, Plaintiff's primary breach of contract claim.

### I. Chapter 93A Claim

Although the Court has now disposed of Plaintiff's fraud and fraudulent inducement claims under New York law, Plaintiff nevertheless insists that it is entitled to pursue a separate claim against Defendants pursuant to Section 11 of Chapter 93A of the Massachusetts General Laws (*see* Opp'n 17–18), which grants "a person who is engaged in business" the right to sue when it suffers damages resulting from "an unfair or deceptive act or practice by another person also engaged in business," *Manning v.*

*Zuckerman*, 444 N.E.2d 1262, 1264 (Mass. 1983). Plaintiff's Chapter 93A claim is predicated on the same allegations as its fraud and fraudulent inducement claim – namely, Defendants' "fraudulent and material misrepresentations" regarding their plans to remain employed with Oliver Wyman, their plans to exert their best efforts to grow Oliver Wyman's business, and "their submission of flawed, misleading and false financial projections during negotiations with Plaintiff." (FAC ¶¶ 112.)

However, courts have held that where, as here, the claim and requested remedy under Chapter 93A are "highly analogous to a tort claim and remedy," and where, as here, the tortious conduct at issue is actionable under the laws of a state *other than* Massachusetts, a Chapter 93A claim cannot be sustained as a matter of law. *See Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 13 (1st Cir. 1994) ("[Because] the claim is governed by the substantive law of Rhode Island . . . appellant's claim under Chapter 93A is not actionable."); *Fed. Home Loan Bank of Boston v. Ally Fin., Inc.*, No. 11-cv-10952 (GAO), 2013 WL 5466628, at *3 (D. Mass. Sept. 30, 2013) ("Because New York law applies to [plaintiff's tort] claims against [defendants], the Bank has no claim under Massachusetts General Laws, Chapter 93A."); *Plymack v. Copley Pharm., Inc.*, No. 93-cv-2655 (KMW), 1995 WL 606272, at *5 (S.D.N.Y. Oct. 12, 1995) ("Massachusetts law does not apply to this action, and, consequently, summary judgment for defendants on plaintiffs' Chapter 93A claim is warranted."). Because Plaintiff's fraud claims are actionable under New York law, Plaintiff's Chapter 93A claim must be dismissed.

Plaintiff's claim also fails for the related reason that a cause of action under Section 11 of Chapter 93A may be sustained only when "the center of gravity of the circumstances that give rise to the claim is primarily and substantially within" Massachusetts. *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 799 (Mass. 2003). Although this inquiry is "fact intensive" and "[cannot] be reduced to any precise formula," *id.* at 798, courts applying Massachusetts law often consider three factors, including: "(1) where defendant committed the deception; (2) where plaintiff was deceived and acted upon the deception; and (3) the situs of plaintiff's losses due to the deception," *Roche v. Royal Bank of Canada*, 109 F.3d 820, 829 (1st Cir. 1997); *accord Uncle Henry's Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 45 (1st Cir. 2005. Of these factors, "the critical factor is the locus of the recipient of the deception at the time of reliance." *Roche*, 109 F.3d at 830; *see also Bruno Int'l Ltd. v. Vicor Corp.*, No. 14-cv-10037 (DPW), 2015 WL 5447652, at *19 (D. Mass. Sept. 16, 2015) ("It is the location of the person to whom the deceptive statements are made rather than the location of the person who uttered the deceptive or unfair statements that is significant.") (quoting *Workgroup Tech. Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 117 (D. Mass. 2003)). Although Massachusetts law places the burden on the defendant to prevail on this element, *see* Mass. Gen. Laws ch. 93A, § 11, the First Circuit has nonetheless instructed that "if the significant contacts of the competing jurisdictions are approximately in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts," *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012) (quoting *Uncle Henry's Inc.*, 399 F.3d at 45).

Due to the fact sensitivity of the "primarily and substantially" test, federal courts applying Chapter 93A have generally rejected motions to dismiss on this ground, "so long as the complaint alleges that the

16

plaintiff is located, and claims an injury in Massachusetts." *Whitman & Co., Inc. v. Longview Partners (Guernsey) Ltd.*, No. 14-cv-12047 (ADB), 2015 WL 4467064, at *11 (D. Mass. July 20, 2015) (quoting *Guest-Tek Interactive Entm't, Inc. v. Pullen,* 731 F. Supp. 2d 80, 92 (D. Mass. 2010)). Nevertheless, "whether a defendant's actions and transactions occurred primarily and substantially in Massachusetts for purposes of Chapter 93A jurisdiction is unquestionably a matter of law," *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, No. 11-cv-10807 (RGS), 2014 WL 304070, at *5 (D. Mass. Jan. 28, 2014), and therefore, courts have not hesitated to dismiss Chapter 93A claims at the 12(b)(6) stage where a plaintiff fails to allege that it suffered sufficient injuries within Massachusetts, *Bruno Int'l Ltd. v. Vicor Corp.*, No. 14-cv-10037 (DPW), 2015 WL 5447652, at *19 (D. Mass. Sept. 16, 2015); *see also Pine Polly, Inc. v. Integrated Packaging Films IPF, Inc.*, No. 13-cv-11302 (NMG), 2014 WL 1203106, at *8–9 (D. Mass. Mar. 19, 2014); *Travelers Supply, Inc. v. Hilton Head Labs., Inc.*, No. 07-cv-30175 (KPN), 2008 WL 5533434, at *8 (D. Mass. Dec. 23, 2008); *Weber v. Sanborn*, 502 F. Supp. 2d 197, 200 (D. Mass. 2007).

Here, Plaintiff conclusorily avers that Defendants' "acts and omissions took place primarily and substantially within" Massachusetts and further asserts that some of the alleged misrepresentations occurred in face-to-face meetings in Boston. (FAC ¶¶ 28, 113.) Even so, Plaintiff also alleges that many of the alleged misrepresentations and omissions occurred during face-to-face meetings in New York. (*Id.* ¶¶ 13, 28.) And most importantly, Plaintiff's principal place of business is in New York, where the complaint itself alleges that Plaintiff's injuries occurred. (FAC ¶¶ 7, 13; *see also* NSA ¶ 9 (acknowledging that Plaintiff's leadership is based in New York).) In other words, according to the Amended Complaint, the "locus of the recipient of the deception at the time of reliance" was New York. *See Roche*, 109 F.3d at 830.

The Court therefore concludes, as a matter of law, that the center of gravity of the circumstances that gave rise to Plaintiff's Chapter 93A claim *is not* primarily and substantially within Massachusetts. *See Bushkin Assoc., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 672 (1985) (requirement was not met where defendants made allegedly deceptive phone calls from Massachusetts that were received and acted upon in New York, and plaintiffs' losses were incurred in New York); *see also Fishman Transducers, Inc.*, 684 F.3d at 197 (requirement "cannot be satisfied" when "wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the country"); *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 90 (1st Cir. 1995) (requirement was not met where "the allegedly deceptive" document "originated in Massachusetts, but . . . was intended to be, and was, circulated abroad, and plaintiffs received and acted upon it there"); *Softub, Inc. v. Mundial, Inc.*, 53 F. Supp. 3d 235, 258 (D. Mass. 2014) (granting summary judgment dismissing Chapter 93A claim where majority of plaintiff's decisionmakers worked and received the alleged misrepresentations in California, even though defendant was headquartered in Massachusetts, "the majority of the misrepresentations alleged" were made by defendant's agents based in Massachusetts, and the defective products were shipped to plaintiff's facility in Massachusetts); *Bruno Int'l Ltd.*, 2015 WL 5447652, at *19 (dismissing claim where plaintiff failed to plead any injury in Massachusetts, notwithstanding fact that defendant was headquartered in Massachusetts and its executives met with plaintiff in

17

Massachusetts). Because the Court concludes that the center of gravity of the circumstances that gave rise to Plaintiff's Chapter 93A claim is not primarily and substantially within Massachusetts, the Court grants Defendants' motion to dismiss the Chapter 93A claim on this alternative ground as well.

## IV. CONCLUSION

For the reasons set forth, IT IS HEREBY ORDERED that Defendants' motion to dismiss is granted in part and denied in part. Specifically, Defendants' motion to dismiss is granted with respect to Plaintiff's first, second, third, sixth, seventh, eighth, ninth, tenth, and eleventh causes of action. Defendants' motion to dismiss is denied with respect to Plaintiff's fourth and fifth causes of action. The Clerk is respectfully directed to terminate the motion pending at docket number 18.

Discovery in this matter has now closed. (*See* Doc. No. 53.) Accordingly, IT IS FURTHER ORDERED that, no later than October 5, 2016, the parties shall submit a joint letter of no more than three (3) pages proposing next steps in this action.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: September 22, 2016
      New York, New York

\*   \*   \*

Plaintiff Oliver Wyman, Inc. is represented by Jonathan D Polkes and Nicholas James Pappas of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, 25th Fl., New York, New York 10153.

Defendants are represented by Michael Christopher Ledley of Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, Suite 1200, New York, New York 10110.