# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

No. 15 Civ. 5305 (RJS)

---

OLIVER WYMAN, INC.

Plaintiff,

VERSUS

JOHN EIELSON & ALASTAIR ADAM
Defendants.

---

OPINION AND ORDER
September 29, 2017

---

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/17

RICHARD J. SULLIVAN, District Judge:

Plaintiff Oliver Wyman, Inc. brings this action against its former employees – John Eielson and Alastair Adam – alleging fraud and breach of contract in connection with Oliver Wyman's acquisition of Defendants' consulting business in 2014. For their part, Defendants bring a variety of counterclaims alleging, in essence, that Oliver Wyman fraudulently induced them to sell their business.

Now before the Court are (1) Defendants' motion for summary judgment as to Oliver Wyman's remaining breach of contract claims (Doc. No. 81), (2) Oliver Wyman's motion for summary judgment as to Defendants' counterclaims (Doc. No. 76), and (3) assorted motions to seal portions of the briefs and submissions filed in connection with the summary judgment motions (Doc. Nos. 83, 91, 105, 115). For the reasons set forth below, Defendants'

motion is denied, Oliver Wyman's motion is granted in part and denied in part, and the sealing motions are granted, with minor exceptions.

## I. BACKGROUND

### A. Facts

Defendants co-founded and served as co-CEOs of OCC Boston, a "boutique strategy consulting firm" specializing in "the information services sector."[1] (Pl. 56.1 ¶ 2;

---

[1] The following facts are taken from the parties' Local Civil Rule 56.1 Statements, the affidavits and declarations submitted in connection with the instant motion, and the exhibits attached thereto. (Doc. No. 78 ("Pl. 56.1"); Doc. No. 87 ("Def. 56.1"); Doc. No. 96 ("Pl. Counter 56.1"); Doc. No. 101 ("Def. Counter 56.1")). Unless otherwise noted, where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible

Def. 56.1 ¶¶ 4, 5.) Recognizing consulting-industry trends that favored large firms over small ones and that might impact OCC Boston's potential for growth and profits, Defendants began discussing a possible sale of OCC Boston in early 2013. (Pl. 56.1 ¶¶ 3, 4; Def. Counter 56.1 ¶ 3.) Defendants retained financial advisors in late 2013, and, in March 2014, those advisors contacted Oliver Wyman, "an international management consulting firm" based in Manhattan, to gauge the firm's interest in acquiring OCC Boston. (Pl. 56.1 ¶¶ 1, 4, 5.) OCC Boston provided financial and other information that "persuaded [Oliver Wyman] that OCC Boston might be an attractive asset to fold into [its] business," and Oliver Wyman entered into a series of discussions geared toward a possible acquisition. (Id. ¶ 6.)

Throughout the discussions, Oliver Wyman representatives expressed confidence that Oliver Wyman "was a strong platform to support the growth of the OCC Boston business." (Id. ¶ 17.) As the negotiations moved forward, Defendants sought information concerning Oliver Wyman's compensation system, average flow-through rate[2] and partner

<hr>

evidence to refute that fact, or merely objects to inferences drawn from that fact. In deciding this motion, the Court also considered Oliver Wyman's memorandum of law in support of its motion (Doc. No. 77 ("Pl. Mem.")), Defendants' opposition brief (Doc. No. 98 ("Def. Opp'n")), Oliver Wyman's reply brief (Doc. No. 112 ("Pl. Reply")), Defendants' memorandum of law in support of its motion (Doc. No. 82 ("Def. Mem.")), Oliver Wyman's opposition brief (Doc. No. 95 ("Pl. Opp'n")), Defendants' reply brief (Doc. No. 111 ("Def. Reply")), and memoranda of law and declarations and exhibits submitted in support of the various sealing motions (Doc. Nos. 86, 92, 106, 116).

[2] The flow-through rate is a "backward-looking metric" that calculates the percentage of project revenue realized as partner compensation. (See Pl. 56.1 ¶ 9.)

compensation, and various economic metrics for the practice groups into which Oliver Wyman planned to integrate OCC Boston – specifically, the Consumer and Industrial Value Transformation ("CIVT") practice and the Communications, Media, and Technology (CMT) sub-practice. (Id. ¶¶ 7, 12–16.) At the time, Oliver Wyman was in the midst of adopting a new compensation system that would go into effect in 2015, and Oliver Wyman's representatives told Defendants that "partner compensation was in flux." (Id. ¶¶ 7, 10.) However, on June 14, 2014, the head of Oliver Wyman North America, Alan McIntyre, and the head of Oliver Wyman's corporate development department, Simon Harris, met with Adam and told him that Oliver Wyman partners had an average flow-through rate of 30% and compensation of around $1 million. (Id. ¶ 11.) Later that month, McIntyre, Harris, and Martin Kon – a partner in the CIVT and CMT groups – met with Adam again and relayed a flow-through figure in the "[h]igh 20's to 30%." (Id. ¶ 12.) Several months later, on October 9, 2014, McIntyre emailed Adam two documents that included information concerning Oliver Wyman's new compensation model; the previously relayed average flow-through rates; Oliver Wyman's consultant billing rates; and the firm's deferred bonus program, by which a portion of partners' yearly bonuses were put into a deferral "pot" to be paid out over the course of the following three years. (Id. ¶¶ 13–16.)

Defendants were disappointed by the information contained in the October 9 documents, particularly as to Oliver Wyman's relatively higher compensation rates for its non-partner employees and its deferred bonus program. (Id. ¶¶ 21, 23–25.) Defendants also believed that Oliver Wyman was deliberately avoiding questions about CIVT's and CMT's comparative profitability and that this indicated Oliver

Wyman was not as strong a firm as Defendants had believed. (*Id.* ¶ 22.) In response to these concerns, Oliver Wyman agreed that Defendants and the other OCC Boston Partners would not be subject to the deferred bonus program for their first two years at Oliver Wyman. (*Id.* ¶ 25.) Over the next several weeks, Oliver Wyman representatives reached out to Defendants to assuage their concerns about the moneymaking potential at Oliver Wyman. (*Id.*; Def. Counter 56.1 ¶¶ 22–24, 26.)

Despite their misgivings, Defendants ultimately decided to move forward with the sale of OCC Boston to Oliver Wyman for $16.5 million, and, on October 29, 2014, the two firms entered into an Asset Purchase Agreement ("APA") with a closing date of December 2, 2014. (Pl. 56.1 ¶¶ 27, 33; Def. 56.1 ¶ 7; *see also* Doc. No. 89, Ex. A.) As part of the acquisition, both Defendants executed identical employment agreements, which provided that Defendants would work at Oliver Wyman for four years at an annual salary, before bonuses, of $425,000. (Pl. 56.1 ¶ 28; *see also* Doc. No. 89, Exs. C, D.) Defendants also executed identical non-solicitation agreements that prohibited them from (1) soliciting Oliver Wyman clients and prospective clients and (2) causing any employee with whom they worked at the firm to separate from Oliver Wyman. (Pl. 56.1 ¶ 28; Def. 56.1 ¶ 10; *see also* Doc. No. 89, Exs. C at 12, D at 12.)

Soon after the closing in December 2014, Defendants began working at Oliver Wyman's Boston office. Almost immediately, however, Defendants' compensation concerns resurfaced. (Pl. 56.1 ¶ 34.) As Defendants feared, the conversion of OCC Boston projects to Oliver Wyman's compensation structure resulted in reduced profits for partners like Defendants. (*Id.* ¶¶ 34, 35.) Although Oliver Wyman eventually took steps to reduce the shortfall

experienced by former OCC Boston partners, Defendants remained unhappy with their compensation at Oliver Wyman. (*Id.* ¶¶ 36–38.)

By late December 2014, Eielson was already convinced that the sale of OCC Boston had been a mistake and that he wanted to leave Oliver Wyman. (Pl. Counter 56.1 ¶ 40.) On January 25, 2015, Eielson emailed Adam that he was not sure he would "make it to June" and that the situation at Oliver Wyman reminded him of a previous time Defendants had left an employer. (*Id.* ¶ 20.) Adam responded that he thought it would take him "until spring to figure out plan b," but that he did not "think about much else these days." (*Id.*; Doc. No. 97, Ex. E.) And, in a February 19, 2015 email to his wife, Eielson wrote that he did not "really work anymore." (Pl. Counter 56.1 ¶ 20.) In March 2015, Oliver Wyman promoted Adam to be North American geo-coordinator of CIVT and planned to promote Eielson to head the firm's private equity practice. (Def. 56.1 ¶¶ 24, 25.) Nevertheless, Defendants' enthusiasm for the Oliver Wyman merger continued to diminish. Indeed, Defendants' billable hours declined each month they were employed, with neither billing *any* time to clients whatsoever in the month of April. (*Id.*)

That same month, Eielson learned of an opportunity to acquire an information services company. (Def. 56.1 ¶ 29.) Soon thereafter, Eielson informed Adam about the opportunity, sought his advice, and expressed his desire to leave Oliver Wyman to pursue the new venture. (*Id.* ¶¶ 29, 30.) In response, Adam also expressed a desire to leave the firm, and on April 21, 2016, Defendants announced their resignations from Oliver Wyman. In a May 2, 2015 email, sent after Defendants tendered their resignations but before they left the firm,

Eielson wrote to Adam that they needed to be careful about how they characterized their resignations and "stick to the party line." (Pl. Counter 56.1 ¶ 42.) On May 8, 2015, they both left the firm to pursue, together, the opportunity previously identified by Eielson. (Pl. 56.1 ¶ 38; Def. 56.1 ¶¶ 31, 33, 35.) While Defendants "vigorously pursued" the acquisition opportunity, it ultimately did not materialize. (Def. 56.1 ¶ 36.) Since leaving Oliver Wyman, neither Defendant has attempted to return to the consulting business to compete with their former employer. (*Id.* ¶ 37.)

## B. Procedural History

On June 16, 2015, Oliver Wyman commenced suit against Defendants. Although the action was originally filed in New York State Supreme Court, New York County (Doc. No. 1; Def. 56.1 ¶ 1; Def. 56.1 ¶¶ 1–3), Defendants removed the action to this Court on July 9, 2015, pursuant to 28 U.S.C. §§ 1332, 1441, 1446, since Oliver Wyman is a Delaware corporation with its principal place of business in New York and Defendants are Massachusetts citizens. (Doc. No. 1.)

On July 14, 2015, Oliver Wyman filed its first amended complaint, alleging claims for fraudulent inducement, fraud, breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with contractual and business relationships, breach of the implied covenant of good faith and fair dealing, violation of Chapter 93A of the Massachusetts General Laws, and unjust enrichment. (Doc. No. 8.) Defendants moved to dismiss the complaint, and, on September 22, 2016, the Court granted the motion in substantial part, leaving only Oliver Wyman's breach of contract claims under the employment agreements and non-

solicitation agreements. (Doc. No. 60.) *See also Oliver Wyman, Inc. v. Eielson*, No. 15-cv-5305 (RJS), 2016 WL 5339549 (S.D.N.Y. Sept. 22, 2016).

On March 17, 2016, Defendants answered the first amended complaint, asserting counterclaims for fraud, fraudulent inducement, negligent misrepresentation, deceit, and violation of Chapter 93A of the Massachusetts General Laws. (Doc. Nos. 37, 73.) Oliver Wyman answered Defendants' counterclaims on May 6, 2016. (Doc. No. 58.) Discovery concluded on June 20, 2016, and on December 16, 2016, the parties both moved for summary judgment as to their opponents' claims. (Doc. Nos. 76, 81.) The motions were fully briefed on February 3, 2017. (Doc. Nos. 111, 112.)

## II. SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### A. Defendants' Motion

Defendants move for summary judgment on Oliver Wyman's remaining breach of contract claims, arguing that (1) Oliver Wyman failed to establish that Eielson breached the non-solicitation agreement, (2) the non-solicitation agreement is unenforceable as a matter of public policy, (3) Oliver Wyman failed to establish that Defendants acted in bad faith under the employment agreements, and that, in any event, (4) Oliver Wyman's failure to comply with the notice-and-cure provision of the agreement defeats its claim of breach. The Court will address each of these arguments in turn.

### 1. Breach of Non-Solicitation Agreement

Section 2 of Eielson's non-solicitation agreement reads:

Employee acknowledges and agrees that, solely as a result of employment by the Company, and in light of the broad responsibilities of such employment, which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information regarding the Company's other employees. Accordingly, both during employment by the Company and for a period of twelve (12) months thereafter, *Employee shall not*, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, *solicit or endeavor to cause any employee of the Company* with whom Employee, during the last two (2) years of Employee's employment with the Company, came into contact for the purpose of selling or providing Consulting Services or soliciting Clients and Prospects for the purpose of selling or providing Consulting Services, or about whom Employee obtained Confidential Information, *to separate from employment by the Company*.

(Doc. No 89, Ex. C at 12 § 2 (emphasis added).) In short, this clause barred Eielson from soliciting Oliver Wyman co-workers – including his longtime partner, Adam – to

5

leave the firm for alternative business opportunities, whether for his own benefit or for the benefit of another person or entity.

In support of its position that Eielson breached this clause, Oliver Wyman offers several pieces of evidence. First, as noted above, email traffic between Eielson and Adam reveals that the two men discussed leaving Oliver Wyman as early as January 2015. (Pl. Counter 56.1 ¶ 31.) Furthermore, when Eielson learned of the investment opportunity, he brought it to Adam's attention and they "talk[ed] through [the] pros and cons" of leaving Oliver Wyman. (*Id.* ¶¶ 29, 30.) They also talked about the potential structure and name for the fund they would use to acquire the target business. (*Id.* ¶ 30.) And, of course, Defendants resigned from Oliver Wyman on the same day – April 21, 2015 – to pursue the acquisition opportunity. (*Id.* ¶ 33, Pl. 56.1 ¶ 36.) Emails between Defendants indicate their desire for secrecy and their efforts to coordinate what they would say about their departure. (Pl. Counter 56.1 ¶ 42.)

For his part, Defendants argue that Eielson encouraged Adam to *remain* at Oliver Wyman because of the riskiness of the acquisition opportunity. (Def. 56.1 ¶ 32.) Additionally, Defendants note that Adam was already deeply unhappy at Oliver Wyman and that he required no encouragement from Eielson to leave the firm. (*Id.* ¶ 31; Pl. Mem. 13.) At bottom, Defendants argue that all Oliver Wyman can point to in support of its solicitation argument is that Adam and Eielson both resigned on the same day and left to pursue the same opportunity. Based on the record before it, the Court has little difficulty concluding that there is a dispute of material fact as to whether Eielson solicited Adam to leave Oliver Wyman.

A closer question, however, is whether the non-recruitment clause in question is enforceable under New York law.[3] New York courts have generally concluded that restrictive covenants in employment contracts – such as non-compete, non-solicitation, and non-recruitment clauses – must be subjected to heightened judicial scrutiny since they potentially impinge on individual agency and an employee's ability to make a living. *See, e.g.*, *Crye Precision LLC v. Duro Textiles, LLC*, 689 F. App'x 104, 106 (2d Cir. 2017) (non-compete clause); *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 535–36 (S.D.N.Y. 2016) (non-solicitation clause); *Mastercard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 600 (S.D.N.Y. 2016) (non-recruitment clause); *Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13-cv-8739 (PKC), 2014 WL 97317, at *7 (S.D.N.Y. Jan. 9, 2014) (non-recruitment clause). In order to determine whether a given restrictive covenant is reasonable, and thus enforceable, courts applying New York law typically employ the three-factor reasonableness test set forth in *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382 (1999). Under the *BDO Seidman* test, a restraint is reasonable "only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the

---

[3] As the Court already discussed in its September 22, 2016 Opinion and Order, the employment agreement and the non-solicitation agreement contain New York choice-of-law clauses. *See Oliver Wyman*, 2016 WL 5339549, at *3; (*see also* Doc. No. 89, Exs. C § 12, D § 12). These clauses are generally enforceable in New York and several meetings central to the parties' business relationship took place in New York. Accordingly, the Court applies New York law to Oliver Wyman's breach of contract claims. *See Oliver Wyman*, 2016 WL 5339549, at *3 (citing *Ergowerx Int'l, LLC v. Maxell Corp. Of Am.*, 18 F. Supp. 3d 430, 439 n.5 (S.D.N.Y. 2014) and *Weisbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006)).

employee, and (3) is not injurious to the public." *BDO Seidman*, 93 N.Y.2d at 389–90.

As to the first *BDO Seidman* factor, courts require the showing of both a legitimate interest of the employer and that the clause is no more expansive than necessary to further that interest. "New York courts have recognized four legitimate interests that may be asserted to support a restrictive covenant: (1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary." *Reed Elsevier Inc.,* 2014 WL 97317, at *8. As to the final interest, courts applying New York law have recognized two categories of employees sufficiently unique to warrant the imposition of restrictive covenants: first, those with special talents – including professional athletes or entertainers – and, second, employees whose services are practically irreplaceable "based on their unique relationships with the customers with whom they deal." *Id.* at *11. The determination of enforceability "focuses on the particular facts and circumstances giving context to the agreement." *BDO Seidman*, 93 N.Y.2d at 390.

Oliver Wyman offers two interests underpinning the non-recruitment clause at issue here – the need to retain the services of unique employees like Defendants, who are leaders of their practice groups, and the need to protect its client base. Of course, these two interests are interrelated, and Oliver Wyman offers an expert witness declaration to support its position that client relationships are important and unique in consulting, and that the loss of a consultant with strong client relationships can dramatically undercut a consultancy's business. (*See* Doc. No. 97, Ex. A ¶¶ 26, 27, 32.) Indeed, like many service-oriented businesses, Oliver Wyman depends on client relationships for its success. Defendants do not dispute that assertion, but they counter that restrictive employment covenants exist only to protect an employer against *competition* from a former employee. (Def. Mem. 15–17.) As Defendants see it, the clause cannot be enforced against them because Defendants have not competed against Oliver Wyman since resigning from the firm and because the alleged recruitment attempt by Eielson involved an opportunity in an unrelated business sector. But even without direct competition, the recruitment of Oliver Wyman employees could result in harm to legitimate interests under New York law. As Oliver Wyman's expert states, the departure of a respected consultant can start a chain reaction of client dissatisfaction, harming the firm's valid interest in protecting its client base. This could be true whether the consultant left to join a competitor or merely to pursue a different life activity. Either way, Oliver Wyman would still be at risk of losing valuable clients and business as a result of Adam's Eielson-influenced departure. And so the Court concludes that Oliver Wyman has legitimate interests that support the enforceability of the non-recruitment clause.

Nonetheless, while Oliver Wyman has a valid interest in restricting the ability of its employees to encourage fellow employees to separate from the company, the Court must still consider whether the restrictive covenant here is "greater than is required" for the advancement of that interest. There can be no doubt that the non-recruitment clause here is quite broad, as it expressly prohibits Defendants from "solicit[ing] or endeavor[ing] to cause any employee . . . to separate from employment by the Company." Taken to its extremes, this provision could be read to bar even the most

innocuous conversations between coworkers regarding professional and personal advice. For example, one can easily imagine scenarios in which an employee might seek advice from a co-worker concerning a job opportunity, headhunter call, or contemplated life change that would inevitably result in separation from the firm – perhaps to become a full-time parent, go back to school for a degree, pursue a career in the arts or a religious vocation, or some other radical career change. A non-recruitment policy that would compel silence in such circumstances would certainly be overly broad, impose undue hardship on the co-worker, and be injurious to the public.

Fortunately, the non-recruitment clause here contains additional language that appears to limit the provision's scope to situations where the solicitor or encourager is doing so on his "own account or on behalf of any person, company, corporation, or other entity." This limitation would seem to indicate that the clause is intended to have a narrower scope and only prevents the poaching of co-workers for actual, available employment opportunities in which the solicitor has an interest. Such an interpretation is in keeping with longstanding principles of contract interpretation requiring courts to give effect to every term and avoiding rendering contractual language superfluous. *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). And, in any case, whether this interpretation was intended by the parties or not, the Court would adopt this narrower application of the non-recruitment clause because it protects the employers' interest in ensuring that its employees do not actively solicit their co-workers for their own benefit without chilling water-cooler conversations or offers of advice for purely altruistic purposes. Indeed, under New York law, courts are empowered to edit the language of restrictive covenants to ensure that the provision in question is no broader than necessary to protect the employer's legitimate interests. *See, e.g.*, *BDO Seidman*, 93 N.Y.2d at 394–96 ("blue penciling" the clause to read out its broadest – and overly burdensome – prohibitions); *Marsh USA Inc.*, 183 F. Supp. 3d at 537 (S.D.N.Y. 2016) (same).

Thus narrowed, the non-recruitment clause is able to meet the standards of the *BDO Seidman* test. In addition to being no greater than required to protect the legitimate interests of the employer, it imposes no undue hardship on Eielson – a highly compensated individual who received a share of the $16.5 million purchase price of OCC Boston and $425,000 in annual salary before bonuses. And, unlike a non-compete clause, the non-recruitment clause imposes no limitations on the work *Eielson* can perform – it only limits his ability to recruit *others* from Oliver Wyman to join him. *Accord Renaissance Nutrition, Inc. v. Jarrett*, No. 08-cv-800S, 2012 WL 42171, at *5 (W.D.N.Y. Jan. 9, 2012) (noting that non-recruitment clauses are "inherently more reasonable and less restrictive" than non-compete clauses). As to the third *BDO Seidman* factor, the clause as interpreted is not injurious to the public. *See, e.g.*, *MasterCard Int'l*, 164 F. Supp. 3d at 602 (noting that a non-recruitment clause does not unduly limit employees from learning of alternative job opportunities). The Court also concludes that the clause's duration – extending for the period of Eielson's employment and the year following – is not unduly burdensome. "New York courts have routinely found one-year restrictions to be reasonable." *Marsh USA Inc.*, 183 F. Supp. 3d at 535 (quoting *Marsh USA Inc. v. Karasaki*, No. 08-cv-4195 (JGK), 2008 WL 4778239, at *16 (S.D.N.Y. Oct. 31, 2008)).

Given the Court's finding that the non-recruitment clause here is enforceable, factual issues clearly remain as to whether Eielson actually breached that provision. As noted above, Eielson insists that he actually encouraged Adam to *remain* at Oliver Wyman and that the emails cited by Plaintiff are taken out of context and fail to reflect that Adam had decided to leave the firm long before Eielson shared his news about the possibility of acquiring an information-services company. Nevertheless, the timing of Defendants' departure, combined with the email correspondence between the two men, supports a compelling inference that Eielson did in fact encourage Adam to leave the firm to work with him on a new commercial venture. It is for the jury to decide which version of events is worthy of belief, rendering summary judgment inappropriate here.

### 2. Breach of Employment Agreements

Oliver Wyman also alleges that, from the beginning of their employment at Oliver Wyman, Defendants were committed to leaving the firm and hardly worked, thereby breaching the "best efforts" clause of their employment agreements. Defendants argue that Oliver Wyman has presented no evidence of a breach, and, in any case, they are absolved of liability for any breach because Oliver Wyman failed to provide the requisite advance notice that their performance was deficient.

Defendants' employment agreements provide that they must "perform and discharge" their positions "in good faith." (Doc. No. 89, Exs. C, D § 2; *see also* Def. 56.1 ¶ 11.) In addition, subject to certain exceptions, Defendants agreed to "devote substantially all of [their] professional time, attention and energies to the business of

Oliver Wyman." (Doc. No. 89, Exs. C, D § 7(a); *see also* Def. 56.1 ¶ 11.)

Clearly, there is a dispute of material fact about whether Defendants acted in good faith and devoted substantially all of their time to their new business. On the one hand, Defendants argue that they were either promoted or promised promotions, indicating strong performance. (Def. 56.1 ¶¶ 24, 25.) On the other hand, Oliver Wyman has submitted evidence that neither Eielson nor Adam had sufficient client hours for any month of their employment, that both Defendants' billable hours declined each month they spent at Oliver Wyman, and that neither billed *any* hours to clients at all in the entire month of April. (Pl. Counter 56.1 ¶ 20.) The parties further dispute whether Defendants had high or low "utilization" statistics compared to their co-workers. (*Compare* Def. 56.1 ¶¶ 26, 27, *with* Pl. Counter 56.1 ¶¶ 26, 27.)

Oliver Wyman has also submitted evidence, including statements made by Defendants in emails, that could be read to indicate that they were planning their exit from Oliver Wyman before they even started at the firm. For example, Eielson realized in December 2014 that the sale of OCC Boston was a "mistake," and he considered leaving Oliver Wyman at this time. (Doc. No. 97, Ex. H, 215:9–217:16.) Furthermore, a January 2015 email exchange – in which Eielson told Adam that he may not "make it to June," and Adam replied that he thought it would take him "until spring to figure out plan b" but that he did not "think about much else these days" (Doc. No. 97, Ex. E) – reflects Defendants' nascent plans to leave the firm even as they were tasked with running important practice groups there. And in February 2015, Eielson emailed his wife: "I don't really work anymore." (*Id.*, Ex. F.) As a result, there appears to be ample evidence supporting Oliver Wyman's

claim that Defendants failed to provide their "best efforts" as required by the employment agreements.

Defendants argue, however, that even if they breached the employment agreements, those breaches are excused, and Oliver Wyman's breach of contract claim fails as a matter of law, because Oliver Wyman did not comply with the agreements' notice-and-cure provision. That provision requires Oliver Wyman to provide "prompt written notice" "specifying in reasonable detail the conduct or act constituting such violation" and an opportunity to cure. (Doc. No. 89, Ex. C § 7(b).) There is no dispute that Oliver Wyman provided any such notice to Defendants prior to their departure in April 2015, and that Defendants were therefore not given an opportunity to cure the violation. Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) *adequate performance by the plaintiff*, (3) breach by the defendant, and (4) damages. *Fischer v. Mandell LLP v. Citibank, N.A.*, 622 F.3d 793, 799 (2d Cir. 2011). As a result, Defendants argue that Oliver Wyman cannot prove the second element of their breach of contract claim.

But as the Court previously stated in its September 22, 2016 opinion:

[W]hile it is true that a party generally may not recover under a contract if it has failed to fulfill a condition precedent, such as a notice-and-cure provision, *see Unloading Corp. v. State of New York*, 132 A.D.2d 543, 543 (2d Dep't 1987), "New York common law will not require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless," *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209 (2d Cir. 2014).

*Oliver Wyman*, 2016 WL 5339549, at *9. As a result, the Court previously found it "plausible" that the short duration of Defendants' employment – lasting for just a few months – and the abruptness of their departure could excuse Oliver Wyman's failure to comply with the notice-and-cure provision, since there may have been insufficient time to discover and/or confront Defendants on their bad faith performance, in which case "compliance with the condition precedent would have been futile." *Id.*

The Court concludes that there is a genuine dispute of fact as to whether notice would have been futile, thereby absolving Oliver Wyman from complying with the notice-and-cure clause. The question of whether Oliver Wyman adequately performed under the contract is thus a fact-intensive determination that must be made by the jury. *Accord Sea Tow Servs. Int'l, Inc. v. Pontin*, 607 F. Supp. 2d 378, 389–91 (E.D.N.Y. 2009). Accordingly, summary judgment is likewise not appropriate on Oliver Wyman's claim for breach of the employment contract.

B. Oliver Wyman's Motion

Defendants assert counterclaims for fraud, fraudulent inducement, negligent misrepresentation, deceit, and violation of Chapter 93A of the Massachusetts General Laws based on Oliver Wyman's allegedly false statements regarding (1) Oliver Wyman's flow-through rate, (2) Oliver Wyman's partner-compensation figures, and (3) the general strength of the CIVT and CMT platforms. In moving for summary judgment, Oliver Wyman argues that those statements are non-actionable as a matter of law because they are opinion, true, and/or were not relied upon by Defendants. The Court will address each argument in turn.

## 1. Fraud, Fraudulent Inducement, and Deceit

Defendants' counterclaims for fraud, fraudulent inducement, and deceit involve either identical or nearly identical elements, so the Court considers them together.

Under Massachusetts law,[4] fraud and fraudulent inducement claims based on misstatements require a showing that the speaker made a (1) knowingly (2) false representation (3) of material fact (4) for the purpose of prompting a given action (5) that the listener actually relied and acted upon to her detriment. *See Balles v. Babcock Power*, 70 N.E.3d 905, 913 (Mass. 2017) (quoting *Danca v. Taunton Sav. Bank*, 429 N.E.2d 1129, 1133 (Mass. 1982)) (applying these elements to a fraud claim); *see also Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 225 (1st Cir. 2003) (applying these elements to a fraudulent inducement claim). A claim for deceit is closely related and requires a plaintiff to show that the defendant "made a false representation of material fact; for the purpose of inducing reliance; and that [the] plaintiff relied upon the representation to his or her detriment." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 22 (1st Cir. 2001) (citing *Danca*, 429 N.E.2d

at 1133 and *Snyder v. Sperry & Hutchinson Co.*, 333 N.E.2d 421, 428 (Mass. 1975)). Thus, the only difference between fraud and fraudulent inducement on the one hand, and deceit on the other, is the absence of a knowledge requirement with the latter.

A representation is material where "a reasonable man would attach importance [to it] in determining his choice of action in the transaction in question." *Zimmerman v. Kent*, 575 N.E.2d 70, 74–75 (Mass. App. Ct. 1991) (quoting *Rogen v. Ilikon Corp.*, 361 F.2d 260, 266 (1st Cir. 1966)); *accord Universal Health Servs. v. United States*, 136 S. Ct. 1989, 2002–03 (2016). Furthermore, a representation is not a material *fact*, and is therefore not actionable, where "the representation 'concerned a matter of opinion, estimate or judgment, which was not susceptible of actual knowledge at the time of its utterance.'" *Hallmark Inst. of Photography, Inc. v. CollegeBound Network, LLC*, 518 F. Supp. 2d 328, 332 (D. Mass. 2007) (quoting *Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F. Supp. 1188, 1199 (D. Mass. 1990)); *see also Rodowicz v. Mass. Mut. Life Ins. Co.*, 192 F.3d 162, 175–176 (1st Cir. 1999) (quoting *Yerid v. Mason*, 170 N.E.2d 718, 720 (Mass. 1960), for the proposition that "'false statements of opinion, of conditions to exist in the future, or of matter promissory in nature' are not actionable in a claim for misrepresentation").

Finally, a plaintiff – actually Defendants on the counterclaims here – must have relied on the misstatement in question and that reliance must have been reasonable. *See Masingill v. EMC Corp.*, 870 N.E.2d 81, 88–89 (Mass. 2007). With respect to reliance, Massachusetts courts have recognized that "[i]t is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a

---

[4] The APA's choice of law provision does not apply to these tort claims. In the Court's September 22, 2016 Opinion, the Court determined that New York law applied to *Oliver Wyman's* fraud claims. *See Oliver Wyman*, 2016 WL 5339549, at *4. However, unlike Plaintiff, which is a New York corporation, both Defendants are Massachusetts citizens and lived and worked in that state at all times relevant to this action. Indeed, the parties do not dispute that Massachusetts law applies to Defendants' tort and Massachusetts statutory counterclaims, and both parties cite exclusively to Massachusetts law in their briefs, thus "implied[ly] consent[ing]" to Massachusetts law governing the adjudication of Defendants' counterclaims. *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31–32 (2d Cir. 2017) (quoting *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009)).

written contract." *Id.* at 89. Furthermore, "[r]eliance is not reasonable where the alleged representations are vague or indefinite." *Armstrong v. Rohm & Haas Co., Inc.*, 349 F. Supp. 2d 71, 81 (D. Mass. 2004) (citing *Saxon Theatre Corp. of Boston v. Sage*, 200 N.E.2d 241 (1964)).

a. Statements Concerning
Flow-Through Rates

Defendants assert that Oliver Wyman committed fraud in its statements concerning historical flow-through rates. Specifically, Defendants claim that Oliver Wyman agents consistently represented a 30% flow-through figure as the "benchmark" rate that Defendants could expect to realize as Oliver Wyman partners. (Def. Counter 56.1 ¶¶ 12, 22–24.) Oliver Wyman disputes this point, claiming that its representatives quoted only a backward-looking figure and gave an average rate of 30% and a general range of 20–40%. (Pl. 56.1 ¶¶ 11–14, 16.) In any case, Oliver Wyman argues that even accepting Defendants' version of the facts, any statements concerning the flow-through rates are non-actionable predictions and/or true.

With respect to Oliver Wyman's first argument – that flow-through rate representations were non-actionable predictions that cannot give rise to tort claims – it bears noting, as a preliminary matter, that any alleged statements by Oliver Wyman representatives concerning *historical* flow-through rates would, by definition, not be predictions, but rather statements of past facts, which are actionable if materially false, *see Zimmerman*, 575 N.E.2d at 74–75. But even forward-looking statements may be actionable in certain circumstances. Indeed, under Massachusetts law, "a statement that in form is one of opinion may constitute a

statement of fact if it may reasonably be understood by the recipient as implying that . . . there are no facts that are incompatible with [the opinion]." *McEneaney v. Chestnut Hill Realty Corp.*, 650 N.E.2d 93, 96 (Mass. App. Ct. 1995); *see also Hallmark Inst. of Photography*, 518 F. Supp. 2d at 332.

Here, the evidence in the record bears out that the overall flow-through rates at Oliver Wyman were in line with the 30% average and 20–40% range numbers provided to Defendants. (*See* Pl. 56.1 ¶ 20; Doc. Nos. 79, Ex. N; 80 ("First Cunningham Decl."), Ex. 1.) Defendants offer no evidence to rebut the flow-through numbers regarding the firm as a whole. Accordingly, the undisputed facts in the record reflect that Oliver Wyman's statements regarding past flow-through rates were accurate and thus cannot serve as the basis for a fraud claim. *See Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker & Co. Ltd.*, 53 F. Supp. 3d 279, 300 (D. Mass. 2014).

Defendants nevertheless argue that Oliver Wyman's employees made false statements when they characterized CIVT's flow-through rate as "fairly similar" to that of the firm as a whole, when in fact they were in the range of 24–27%. However, in their Rule 56.1 statements, the parties agree that Oliver Wyman never made any specific representations regarding CIVT's *flow-through* rate. Rather, Oliver Wyman represented that CIVT's overall compensation, not flow-through rate, was "fairly similar" to the firm average. (Def. Counter 56.1 ¶¶ 10, 11.) Therefore, Defendants have also failed to demonstrate falsity with respect to these statements.

Finally, Defendants argue that Oliver Wyman's representatives repeatedly touted 30% as the "benchmark" for what Defendants could expect to realize at CIVT, even though those representatives possessed

information that was "incompatible with" that estimate. *McEneaney*, 650 N.E.2d at 96. Specifically, Defendants point to evidence suggesting that Oliver Wyman representatives were aware that a 30% flow-through rate was unrealistic based on Oliver Wyman's higher staff rates and the fact that Kon had "never been paid ███" flow through. (*See* Doc. No. 102, Exs. L at 2, Q.) But far from "implying that . . . there [were] no facts incompatible with" the opinion that 30% flow-through was the "benchmark" for Defendants should they join CVIT, Oliver Wyman was upfront with Defendants concerning the contingent nature of that estimate. Indeed, the record is littered with indications that the factors that could complicate actual flow-through rates at the firm were well known to both parties in advance of the sale of OCC Boston. For example, Defendants were aware that compensation structure, benefit calculations, and deferred bonuses could impact realized flow-through rates. (*See, e.g.*, *id.* at 5–6.) And Defendants were also aware that the range of flow-through rates at Oliver Wyman spanned from 20–40% (*see, e.g.*, *id.*), which is itself an acknowledgement of the uncertain nature of the prediction. Defendants' knowledge of these facts and potential complications disallows any suggestion that Oliver Wyman's forward-looking "benchmark" opinion was actually an actionable statement of fact under *McEneaney*. Clearly both Oliver Wyman and Defendants were aware of facts that could limit Defendants' ability to realize the 30% flow-through figure. Accordingly, the Court also grants summary judgment with regard to any representations concerning the flow-through rate Defendants could *expect* once they worked for Oliver Wyman.

## b. Statements Concerning Partner Compensation

Similar to their arguments concerning flow-through rates, Defendants also aver that Oliver Wyman made material misstatements concerning the firm's average historical partner compensation. Essentially, Defendants claim that Oliver Wyman falsely represented that average partner compensation was $1.1 million and that CIVT partner compensation was "fairly similar" to the firm-wide average. (Def. Counter 56.1 ¶ 11.) For its part, Oliver Wyman acknowledges that it represented average partner compensation as "around $1 million." (Pl. 56.1 ¶ 11.) Oliver Wyman nevertheless argues that the statements were (1) non-actionable estimates, (2) true, (3) too indefinite to rely upon, and/or (4) supplanted by the explicit terms of the employment agreements. The Court disagrees.

First, Oliver Wyman's representation that average partner compensation was "around $1 million" is not an estimate of forward-looking results, but rather an approximation of historical performance, which is a statement of fact. *Cf. Hallmark Inst. of Photography*, 518 F. Supp. 2d at 332 (holding that representations about the *prospective* effectiveness of a marketing campaign was a "classic matter of 'estimate or judgment'"). As noted above, the estimate-or-opinion exception is not intended to protect potentially material misstatements of historical fact merely because they are couched as ranges, averages, or in generalities. *See id.*

Second, although Oliver Wyman has presented evidence suggesting that the $1 million per-partner average compensation figure was accurate both firm-wide and within CIVT (*see* Pl. 56.1 ¶¶ 18, 19), there appears to be a material dispute of fact on this issue since Defendants have submitted

evidence indicating that the actual average compensation rates were measurably lower (*see, e.g.*, Doc. No. 79, Ex. 10; Doc. No. 102, Ex. Y). And even taking Oliver Wyman's numbers at face value, the records show that there were some years where the average compensation was lower than represented to Defendants. For example, according to Oliver Wyman's data, the average compensation paid to Oliver Wyman and CIVT partners in 2013 – the year immediately preceding the OCC Boston acquisition – was ███████ and █████ respectively. (Pl. 56.1 ¶¶ 18, 19.) Whether these figures are "fairly similar to" $1 million, or whether the $1 million statement was designed to obscure the more recent trend of lower compensation is for a jury to decide.

Oliver Wyman next argues that its compensation formula was being "reworked" at the time of the statements in question and that the average compensation numbers cited were therefore too indefinite to spur reliance. This argument must also be rejected. While Oliver Wyman's firmwide compensation formula may have changed over time, there is no evidence to suggest that such modifications would result in fundamental changes to the compensation Oliver Wyman partners brought home every year. The situation here is a far cry from other cases cited by Oliver Wyman in which extremely ambiguous and incomplete representations were found to be too indefinite to justify reliance. *See, e.g.*, *Armstrong*, 349 F. Supp. 2d at 81. Here, there is no similar ambiguity. While the precise formula for the compensation system might have been up in the air, Oliver Wyman persisted in stating what the average compensation was without suggesting that the new formula made those representations about prior years' performance irrelevant for purposes of assessing future profitability.

Finally, Oliver Wyman argues that Defendants cannot demonstrate reasonable reliance on Oliver Wyman's statements regarding average compensation because those statements were superseded by the explicit terms of Defendants' employment agreements. As noted above, both Defendants signed contracts providing for an annual base salary of $425,000 "subject to upward adjustment at the sole discretion of Oliver Wyman pursuant to Oliver Wyman's compensation practices." (Doc. No. 89, Exs. C § 3(a), D § 3(a); *see also* Pl. 56.1 ¶ 29.) Accordingly, Oliver Wyman asserts that it is objectively unreasonable for Defendants to have relied on the average partner compensation previously quoted by Oliver Wyman partners since their agreements themselves provide for a salary far below the approximately $1 million figure. *See Masingill*, 870 N.E.2d at 89 ("It is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a written contract.")

But while it is true that Massachusetts law precludes fraud claims where alleged misstatements are explicitly contradicted by subsequently adopted written agreements, *see, e.g.*, *HSBC Realty Credit Corp. (USA) v. O'Neill*, 745 F.3d 564, 571 (1st Cir. 2014); *Turner v. Johnson & Johnson*, 809 F. 2d 90, 96 (1st Cir. 1986); *Massingill*, 870 N.E.2d at 88–89; *Kuwaiti Danish Comput. Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 795–96 (Mass. 2003), courts have been careful to limit this rule to situations where the alleged falsehood was squarely contradicted by the written agreement. *See, e.g.*, *Starr v. Fordham*, 648 N.E.2d 1261, 1268 (Mass. 1995) (holding that a representation that business origination would not be a significant factor in partner profits was not plainly contradicted by a clause vesting the founding partners of the firm with the discretion to allocate profits).

Here, Oliver Wyman's representation that its average partner makes around $1 million a year is not plainly contradicted by a provision guaranteeing Defendants no more than $425,000 a year. Thus, while Defendants were not entitled to earn more than the $425,000 guaranteed by the contract, they could have justifiably relied on the representation of a $1 million per year historical average in assessing Oliver Wyman's strength and profitability. In other words, the inclusion of a minimum-salary provision in a written employment agreement does not excuse prior false statements regarding historical compensation data where a party relied on that data in entering into the contract. It cannot be said that no reasonable factfinder could conclude that Oliver Wyman's statements about historical compensation were materially false and were relied upon by Defendants when they decided to sell their business and join Oliver Wyman.

Accordingly, because disputes of material fact exist as to whether Oliver Wyman's statements concerning average partner compensation were materially false and whether Defendant's reliance upon them was reasonable, summary judgment is not appropriate for these claims.

### c. Statements Regarding the Strength of the Platform

Finally, Defendants argue they were defrauded by a third class of misrepresentations: statements regarding the strength of Oliver Wyman's "platform" as a vehicle to absorb and grow the OCC Boston business. Oliver Wyman representatives allegedly told Defendants "that Oliver Wyman would provide a strong platform with multiple synergies for [their] business." (Doc. No. 79, Ex. 3 at 305:15–23.) Defendants argue that these statements, which painted "a rosy picture about the strength of the platform and the earning potential" (*id.* at 196:23–24), were demonstrably false, since Oliver Wyman's own internal communications, made both before and after the acquisition of OCC Boston, reveal that CIVT was in "███████████" and that CMT was "███████████████" at the time of the transaction (Def. Opp'n 16–17). Defendants also point to evidence indicating that Oliver Wyman was aware that these groups had profitability and morale issues and that they might not have been strong platforms to support the growth of OCC Boston's business. (*See, e.g.*, Doc. No. 102, Exs. T, U.)

Whatever the misgivings expressed internally at Oliver Wyman about CIVT and CMT, the Court finds that the alleged misstatements here are not actionable. "When a company makes a 'kind of general, rosy affirmation,' these statements are puffery and 'cannot have been material to any reasonable analysis of the company's prospects.'" *NPS, LLC v. Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 171 (D. Mass. 2010) (quoting *Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 301 (D. Mass. 2004)). The generic and relative corporate platitudes at issue here – that Oliver Wyman offered a "strong platform" with "multiple synergies" – is just that kind of non-actionable puffery. It is an optimistic and consultant-speak portrayal of corporate health that is not only indefinite but also not "susceptible of actual knowledge" because it is opinion. *See Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 21 (1st Cir. 2001) (quoting *Restatement (Second) of Torts* § 538A and *McEneaney*, 650 N.E.2d 93 for the proposition that a "representation is one of opinion if it expresses . . . judgment as to quality, value, authenticity, or other matters of judgment"); *cf. Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) (concluding, in the federal

securities fraud context, that a corporate culture characterized as "strong" was too indefinite to support a fraud claim). The same can be said with respect to the statements contained in Oliver Wyman's internal communications. Terms like "█████████" and "█████████" are vague and imprecise colloquialisms that convey little more than opinion and largely defy measurement or proof. Defendants' counterclaim – which essentially alleges that Oliver Wyman's promise of a "strong platform with multiple synergies" must have been false since Oliver Wyman knew that CIVT was in "█████████" and was "█████████" – is almost comical when the actual words are considered. Whatever it means to provide a "strong platform" with "multiple synergies," it is not obviously incompatible with being "█████████" or "█████████." Accordingly, Oliver Wyman's statements concerning platform strength are not actionable, and summary judgment is appropriate as to the claims rooted in these statements.

### 2. Negligent Misrepresentation

Defendants also assert a counterclaim for negligent misrepresentation with respect to each of the misrepresentations alleged in their fraud claims.

To bring a claim for negligent misrepresentation, Defendants must show that Oliver Wyman "(1) in the course of [its] business, (2) supplie[d] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and (6) failure to exercise reasonable care or competence in obtaining or communicating the information." *First Marblehead Corp. v. House*, 473 F.3d 1, 9 (1st Cir. 2006) (alterations in original) (quoting *Nota*

*Constr. Corp. v. Keyes Assocs.*, 694 N.E.2d 401, 405 (Mass. App. Ct. 1998)).

Here, as discussed above, Defendants have failed to offer any evidence demonstrating that Oliver Wyman's representations regarding the flow-through rate were false. *See, e.g.*, *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1031 n.25 (Mass. 2004) (requiring "false information"). Furthermore, Oliver Wyman's statements regarding the strength of its platform are fundamentally statements of non-actionable opinion and puffery. *See Cummings*, 244 F.3d at 21 (noting that negligent misrepresentation claims cannot be predicated on statements of opinion). Accordingly, these statements cannot support a negligent misrepresentation claim. However, because Oliver Wyman's statements regarding average partner compensation can support claims for fraud and deceit, they remain plausible predicates to support a negligent misrepresentation claim as well.

### 3. Chapter 93A Claim

Finally, Defendants assert a counterclaim for a violation of Chapter 93A of the Massachusetts General Laws. That chapter outlaws "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. The statute provides a cause of action to "[a]ny person . . . who suffers any loss of money or property . . . as a result" of another person's engaging in such unfair activity. *Id.* § 11. A practice is unfair or deceptive under the statute "if it is (1) within the penumbra of common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Morrison v. Toys "R" Us, Inc.*,

806 N.E.2d 388, 392 (Mass. 2004) (quoting *Heller Fin. v. Ins. Co. of N. Am.*, 573 N.E.2d 8, 12–13 (Mass. 1991)). The statute is one "of broad impact" with "far-reaching effects." *Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 772 (Mass. 1975).

As discussed above, Oliver Wyman's statements regarding average partner compensation can still support fraud, fraudulent inducement, deceit, and negligent misrepresentation claims at this juncture. Accordingly, because Oliver Wyman's actions could plausibly fall within "the penumbra of common law . . . unfairness," Defendants' Chapter 93A claims based on these alleged misrepresentations also survive Oliver Wyman's summary judgment motion. *See McEvoy Travel Bureau, Inc. v. Norton Co.*, 563 N.E.2d 188, 194–95 (Mass. 1990) ("Common law fraud can be the basis for a claim of unfair or deceptive practices under the statute.")

### III. SEALING

In addition to the parties' cross motions for summary judgment, Oliver Wyman has filed four different motions to seal portions of: (1) its memorandum of law, Rule 56.1 statement, and certain exhibits attached to the declarations of Nicholas Pappas and Matthew Cunningham; (2) Defendants' memorandum of law in support of their motion for summary judgment and certain exhibits attached to the declaration of Matthew Ledley; (3) Defendants' memorandum of law in opposition to Oliver Wyman's motion for summary judgment, Defendants' Rule 56.1 counterstatement, Adam's affidavit, and certain exhibits attached to the declarations of Fletcher Strong and Nicholas Pappas; and (4) Oliver Wyman's reply memorandum in support of its motion for summary judgment. Defendants do not oppose these sealing motions. Nevertheless, in light of the

presumption of open records that applies in federal civil cases, the Court must determine whether Oliver Wyman has adequately rebutted that presumption here. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). Having, viewed the documents in question, the Court concludes that Oliver Wyman has rebutted the presumption with respect to all but a small subset of its proposed redactions.

Specifically, Oliver Wyman hopes to seal the following categories of information (with the relevant filings in parentheses):

1) The average Oliver Wyman partner compensation (Pl. Mem. 9, 10, 16; Pl. 56.1 ¶¶ 18, 19; Doc. No. 79, Exs. 10,[5] 11; Doc. No. 80, Ex. 1; Def. Opp'n 2, 13, 14, 19, 20; Doc. No. 100 at 10; Def. Counter 56.1 ¶ 18; Doc. No. 102, Exs. N, X, Y, Z; Pl. Reply 6, 7);

2) the payout rate and overall compensation paid to current and former Oliver Wyman partners (Doc. No. 79, Ex. 14; Def. Opp'n 15, 20; Doc. No. 102, Exs. B, Q, Z; Pl. Reply 3, 4);

3) internal assessments concerning the competitiveness of Oliver Wyman's practice groups (Def. Mem. 13; Doc. No. 89, Exs. K, L; Def. Opp'n 13, 16, 17, 24; Doc. No. 100 at 10; Doc. No. 102, Exs. A, T, U, X);

4) Oliver Wyman's investment-return payments to its parent company, Marsh & McClennan Companies ("Marsh") (Doc. No. 79, Exs. 6–9;

---

[5] Oliver Wyman argues that this document must be sealed because it discusses "non-public events" in the CIVT group; however, the proposed redactions relate only to compensation figures.

Doc. No. 100, Ex. 1; Doc. No. 102, Exs. F, H, K, L, M, T, U);

5) the identities of Oliver Wyman clients and potential clients (Doc. No. 89, Exs. F, K, N, O; Doc. No. 97, Exs. A, C; Doc. No. 102, Exs. F, M, O, X, Y);

6) internal assessments concerning a non-party Oliver Wyman employee (Doc. No. 89, Ex. L; Doc. No. 102, Ex. I[6]); and

7) internal cost structure data (Doc. No. 102, Ex. L).

The Second Circuit has articulated a three-step inquiry for determining whether documents submitted to a federal court may be sealed in contravention of the presumption of open access to "judicial documents." *Lugosch*, 435 F.3d at 119. First, in order for the presumption of open access to attach, the documents at issue must be "judicial documents," which are "item[s] filed [that are] relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 119. Second, if the documents at issue are "judicial," the Court must then determine the weight of the presumption of access by considering the value of the information in the "exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* Finally, the Court "must balance competing considerations" against the presumption of

access. *Id.* at 120. "Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Id.* (internal quotation marks omitted). As the Second Circuit has instructed, a court must "make specific, rigorous findings before sealing the document or otherwise denying public access." *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 141 (2d Cir. 2016) (quoting *Newsday v. Cty. of Nassau*, 730 F.3d 156, 167 n.15 (2d Cir. 2013)). "[E]ven if material is properly designated as Confidential or Highly Confidential by a protective order governing discovery, that same material might not overcome the presumption of public access once it becomes a judicial document." *Dodona I, LLC v. Goldman, Sachs & Co.*, 119 F. Supp. 3d 152, 155 (S.D.N.Y. 2015).

"The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action . . . ." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997). To meet its heavy burden, the moving party "must offer specific facts demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Wells Fargo Bank, N.A. v. Wales LLC*, 993 F. Supp. 2d 409, 413 (S.D.N.Y. 2014).

With respect to the first step of this analysis, the memoranda in question and their supporting declarations, affidavits, and exhibits are judicial documents because the Court has relied on them in deciding the parties' motions for summary judgment. *See Lugosch*, 435 F.3d at 119.

As for the second step, the weight of the presumption with regard to these documents ranges from low to high. For example, the weight of the presumption is quite high with

---

[6] Oliver Wyman lists Exhibit I to the Strong declaration in its sealing motion and submitted proposed redactions for it; however, Oliver Wyman does not provide a rationale under which it seeks to have portions of this document sealed. Because Exhibit I involves internal assessments concerning a non-party Oliver Wyman employee, the Court assumes Oliver Wyman seeks its redaction for this reason.

regard to the memoranda of law submitted in support of, or in opposition to, the parties' summary judgment motions, as the Court examined and relied on these submissions in adjudicating these potentially dispositive motions. The weight of the presumption is similarly strong with regard to the Rule 56.1 statements, which were also relied upon to ascertain the disputes of material fact. The weight of the presumption is middling to high for the underlying exhibits which supported the assertions made by the parties regarding categories (1), (2), and (3). These exhibits were necessary for the Court to consider the character and truthfulness of Oliver Wyman's allegedly fraudulent assertions to Defendants in the months preceding the acquisition of OCC Boston. While the weight of the presumption with regard to these supporting exhibits may not be quite as high as with the memoranda of law and Rule 56.1 statements, the assertions included in those latter documents could not have been made, or trusted, without the evidentiary support provided by these exhibits. Finally, the weight of the presumption is low with regard to the exhibits Oliver Wyman seeks sealed for categories (4), (5), (6), and (7) because the information Oliver Wyman wants redacted is largely collateral to the factual and legal issues central to the resolution of these motions.

Having determined that all documents in question are judicial documents, as well as the varying weight of the presumption in favor of open records due to these documents, the Court next considers the third *Lugosch* factor – the balancing of competing considerations – for each class of proposed redactions.

With respect to the documents disclosing average and individual partner compensation and information sufficient to deduce partner compensation (including exact flow-through

rates), Oliver Wyman argues that public disclosure would result in great harm, since its competitors would know the average compensation of Oliver Wyman partners and be able to more efficiently hire them away from Oliver Wyman. In support of its position, Oliver Wyman submits two declarations of its Chief Financial Officer, Matthew Cunningham. (*See* First Cunningham Decl.; Doc. No. 107 ("Second Cunningham Decl."). Having reviewed these materials and Cunningham's declarations, the Court agrees that the public disclosure of this information "might harm a litigant's competitive standing." *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)); *see also Playtex Products, LLC v. Munchkin, Inc.*, No. 14-cv-1308 (RJS), 2016 WL 1276450, at *11 (S.D.N.Y. Mar. 29, 2016) (ordering redaction of statements in summary judgment briefs and exhibits detailing party's sales and revenue pursuant to "narrowly tailored" redaction request, where party submitted affidavit explaining why it "would be competitively harmed if they were revealed"); *Gelb v. Am. Tel. & Tel. Co.*, 813 F. Supp. 1022, 1035 (S.D.N.Y. 1993) ("[D]efendants' assertion that its competitors who do not now have this information could use it to do competitive injury to the defendants is, on the facts of this case, a sufficient basis to grant defendants' motion to seal at least at this stage of this litigation.").

Moreover, disclosure of individual partner compensation raises additional unique privacy concerns. As the Second Circuit has instructed, "[t]he privacy interests of innocent third parties should weigh heavily in a court's balancing equation" and "are a venerable common law exception to the presumption of access." *United States v. Amodeo*, 71 F.3d 1044, 1050–51 (2d Cir. 1995); *see also Lown v.*

*Salvation Army, Inc.*, No. 04-cv-01562 (SHS), 2012 WL 4888534, at *2 (S.D.N.Y. Oct. 12, 2012) (ordering redaction of third parties' salary information); *accord Dodona I*, 119 F. Supp. 3d at 156–57; *Saks Inc. v. Attachmate Corp.*, No. 14-cv-4902 (CM), 2015 WL 1841136, at *19 (S.D.N.Y. Apr. 17, 2015). Accordingly, redaction of this salary information "vindicates the privacy interest" these non-parties have "in sensitive personal information" that outweighs the public's interest in disclosure.

The third category of information Oliver Wyman hopes to seal is the firm's internal analysis of the competitiveness of its practice groups. For this information as well, Oliver Wyman makes a compelling argument that its public disclosure would harm its competitive standing. (*See* Second Cunningham Decl. ¶ 5.)

The remaining categories of information Oliver Wyman hopes to seal all carry a low presumption of access to public records because they are collateral to the Court's resolution of the parties' summary judgment motions. Oliver Wyman also sets forth a compelling competitive interest in maintaining the secrecy of its payments to its parent company, the identities of its clients and potential clients, and its cost structure. As the Cunningham Declaration makes clear, public disclosure of Oliver Wyman's payments to its parent company, Marsh, could negatively impact Marsh's ability to compete for new subsidiaries and harm relationships with existing subsidiaries. (*Id.* ¶ 14.) Furthermore, information concerning Oliver Wyman's clientele could constitute a contractual breach and harm Oliver Wyman's ability to maintain its existing clients and attract new clients. (*Id.* ¶ 12.) And disclosure of internal billing rates could place Oliver Wyman at a competitive disadvantage by allowing competitors to undercut Oliver

Wyman's bids and capture a larger market share. (*Id.* ¶ 15.) The Court also agrees that the allegations in the exhibits detailing internal employee evaluations would likely cause embarrassment to third parties and that the third parties' privacy interests outweigh the public's interest in disclosure. *See Amodeo*, 71 F.3d at 1050.

Accordingly, with all but a few exceptions, the Court finds that Oliver Wyman has demonstrated "particular and specific . . . fact[s] showing that disclosure" of the information in question "would result in an injury sufficiently serious to warrant protection" and has rebutted the presumption in favor of open records with respect to the proposed sealing. *See United States v. Wells Fargo Bank N.A.,* No. 12-cv-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015). Nevertheless, the Court rejects Oliver Wyman's redaction requests with regard to the following specific documents and/or passages:

- Exhibit 11 to the Pappas Declaration (Doc. No. 79, Ex. 11): The Court finds that the complete redaction of this document is unwarranted. While some of the information reflected in this email chain – such as specific figures regarding average partner compensation at Oliver Wyman – justify sealing, many components of this chain relate to general statements and pleasantries and therefore implicate no serious countervailing interests. Accordingly, the Court concludes that Oliver Wyman's redaction request is overbroad and that it must be denied.

- Exhibit K to the Strong Declaration (Doc. No. 89, Ex. K): The Court finds that the second and third proposed redactions do not reflect internal assessments concerning the competitiveness of Oliver Wyman

practice groups. They are also overbroad because the information contained within those redactions are otherwise included, unredacted, elsewhere in the document.

- The second and third redactions on page 4 of Oliver Wyman's reply brief (Pl. Reply 4): The Court finds that these proposed redactions are unwarranted since they encompass information that goes beyond Kon's realized flow-through rate, extending to information about the firm's record keeping and conclusions to be drawn from Kon's statements.

In sum, with the exception of the three documents set forth above, Oliver Wyman's sealing requests are granted. If Oliver Wyman wishes to submit revised proposed redactions for any of these three documents, it shall do so no later than October 9, 2017.

Furthermore, for the reasons set forth above, the Court concludes that the presumption of open records has been rebutted with respect to the same pieces of information that are included in this opinion. Accordingly, the publicly docketed version of this opinion will appear in redacted form, with the unredacted opinion filed under seal.

IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendant's motion for summary judgment on Oliver Wyman's breach of contract claims is DENIED.

IT IS FURTHER ORDERED THAT Oliver Wyman's motion to dismiss is GRANTED with respect to alleged misrepresentations concerning flow-through rates and platform strength, and DENIED with respect to alleged misrepresentations concerning average partner compensation.

IT IS FURTHER ORDERED THAT Oliver Wyman's sealing motions are GRANTED in substantial part, with the exception of three documents that included excessive proposed redactions. IT IS FURTHER ORDERED THAT if Oliver Wyman wishes to submit revised proposed redactions for the Court's review, it shall do so no later than October 9, 2017.

IT IS FURTHER ORDERED THAT a trial in this matter shall commence on February 5, 2018 at 9:30 a.m. in Courtroom 905, Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007. Additional pretrial deadlines shall follow shortly in a separately docketed order.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 76, 81, 83, 91, 105, and 115.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 29, 2017
New York, New York

\*        \*        \*

Plaintiff and Counterclaim-Defendant Oliver Wyman, Inc. is represented by Jonathan D Polkes and Nicholas James Pappas of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, 25th Fl., New York, New York 10153.

Defendants and Counterclaim-Plaintiffs are represented by Michael Christopher Ledley of Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, Suite 1200, New York, New York 10110.